Chamberlain v. Chamberlain.

---

Lansing.
3L 348
60ad334
d60ad336

CALVIN T. CHAMBERLAIN, Appellant and Respondent, v. THOMAS J. CHAMBERLAIN and others, Executors, THE CENTENARY FUND SOCIETY, THE ALLEGANY COLLEGE, THE CHAMBERLAIN INSTITUTE and LUCY CHAMBERLAIN, Appellants and Respondents, and THE GENESEE CONFERENCE, &c., Respondent.

(GENERAL TERM, EIGHTH DISTRICT, MAY, 1870.)

The provisions contained in wills made in this State, by persons domiciled here, and for the disposition of property here, are, it seems, subject to the

limitations and restrictions of the statutes of this State, although in their execution the subjects of them are to be ultimately transferred beyond its jurisdiction.

The law of 1860 (chap. 360) restricts the right of testamentary disposition for the benefit of " benevolent, charitable, literary, &c., associations and corporations," in the cases provided, to half of the testator's estate, deducting debts, notwithstanding the half is made up of an aggregate of bequests, &c., distributed among several such associations.

Where any of the bequests making up such aggregate are void, they are in judgment of law as if not made, and are not to be regarded in estimating the portion of the estate given to " benevolent, &c., associations, &c."

The Chamberlain Institute, incorporated as a school or seminary of learning, and having that character, is a literary corporation within the meaning of the act (1860, chap. 360).

The widow's dower right constitutes no part of the testator's estate, and she not having accepted a provision made by the will in lieu thereof, it must be deducted from such estate before estimating the half of the same under the statute. (Id.)

A bequest of a fund to a corporation in Pennsylvania, to be invested and kept permanently invested, and the income thereof used and expended for the benefit of a college corporation of that State, is void, as unlawfully suspending the absolute ownership of personal property.

The testamentary gift of a fund in trust, with discretionary power in the trustee as to its application to the use of the beneficiary, made to a corporation, having no power under its charter to receive property upon such trust, is void. (Per DANIELS, J.)

A bequest to such corporation, in trust, for the benefit of its own members, and also for the benefit of others, there being no method of apportionment provided, is wholly void. (Id.)

Chap. 189 of the act of 1819 incorporated " The trustees of the funds of the Genesee Conference;" but distinguished between it and "The Genesee Annual Conference" as separate organizations, and cannot be regarded as incorporating the latter.

A bequest to the Genesee conference in trust without limitation for certain purposes.—*Held*, invalid for want of capacity in the legatee to take. (Per DANIELS, J.)

And as creating a perpetuity in a legatee not exempted from the operation of the statutes in that respect, by the acts of 1840 (chap. 318) and 1841 (chap. 261).

The bequest of a fund to the trustees of the Chamberlain Institute, a literary incorporated institute of this State (under 1 R. S., 461, § 38, &c.), for investment in bond and mortgage, and to be kept so invested permanently, and the income used in the payment of salaries of tutors, &c., employed to teach in the institute, and in purchasing books and apparatus for its library,—*Held*, valid as a trust under the laws of 1840 (chap. 318) and 1841 (chap. 261).

Chamberlain *v.* Chamberlain.

And per DANIELS, J., it is also valid as substantially a gift of so much money to the corporation.

Where the widow rejects a provision made by the will, in lieu of her dower, bequests which are so dependent upon her acceptance thereof, that it is impossible on account of the rejection, to ascertain the testator's intention respecting them, are void. (Per TALCOTT, J.)

Where the provisions of a will exhibit a purpose of the testator to make a complete and effectual disposition of his entire estate, and pecuniary provision in lieu of dower is also made for the widow, who fails within a year from the death of her husband to enter on the land to be assigned to her for dower, or commence proceedings for recovery or assignment thereof (1 R. S., 742, § 14), the widow is not precluded from declining to accept the provision, and claiming her dower right, if it turn out that the main dispositions made by the will must fail for want of legality. (Per DANIELS, J.)

In view of the abolition of writs of dower and the substitution therefor of actions of ejectment, to be brought after six months from the time the widow's right accrued, so that her action at law is limited to the last six months of the year succeeding her husband's death, the statute (1 R. S., 742, § 14) is harsh in its terms, and is to be most liberally construed in favor of the widow. (Per TALCOTT, J.)

An action in equity to set aside a written election, in which the widow rejects the provisions made by the will in lieu of dower, and asks to have her rights as to the real property of which her husband died seized, declared and adjudged as widow, and not as devisee or legatee, is within the just construction of the words "proceedings for recovery of dower," as contained in § 14, 1 R. S., 742. (Id.)

And if commenced after six months, and within a year from the death of the husband, is a commencement of such proceedings within the statute. (Id.)

But in an action for such purpose under such allegations, the court will, in the exercise of its ordinary jurisdiction, where the allegations are sustained, not only set aside the instrument which purports to be an election, but retain the case for the other and further relief prayed, of "assigning the dower" to the plaintiff. (Id.)

Where a corporation is forbidden by statute to "take and hold" property beyond a certain amount, and the prohibition is not against each separate act, *e. g.* against "taking or holding," the corporation may take in excess of the restriction; but cannot hold as against the State. (DANIELS, J., *contra.*)

Statutory restrictions upon the powers of corporations as to the amount of property they may take and hold, are in the nature of mortmain acts, and a gift, devise or grant to the corporation exceeding the amount to which it is restricted is not void, but voidable at the pleasure of the State only.

Chamberlain *v.* Chamberlain.

The same construction applies to acts restricting the amount of the personal property of corporations, as is applicable to acts in the nature of mortmain acts restricting the quantity of their lands, tenements, &c.

The restriction upon the powers of corporations contained in art. 3, tit. 1, chap. 15, p. 1 R. S., is not for the protection of individuals, but for that of the State against accumulation of property in mortmain.

The acts of 1840 (chap. 318) and 1841 (chap. 261) have repealed the restriction contained in the statute referred to. (Tit. 1, chap. 15, p. 1, R. S.) (DANIELS, J., *contra*.)

APPEALS taken from judgment recovered under the direction of the Special Term, held in Cattaraugus county, before the Hon. GEORGE BARKER, one of the justices of this court, in an action brought to determine the validity of the will of Benjamin Chamberlain, deceased. At the time when the will was executed, the testator resided in the county of Cattaraugus, and the execution of the same took place at West Randolph, in that county, on the 17th of December, 1867. The testator departed this life on the 10th of February, 1868, at the village of Ellicottville, in that county. He left a widow, but no children, surviving him. The will was admitted to probate, by the surrogate of Cattaraugus county, on the 22d of April, 1868. The testator died seized of real estate within this State, and was, at that time, the owner of personal estate to the amount of $250,000, over and above his debts. By the terms of his will, the testator directed his real and personal estate to be sold by his executors, and the proceeds applied to the payment of legacies given and provided for by him. These legacies were mostly of a benevolent and educational character. A portion of them were held to be invalid by the Special Term, and the residue were sustained. All the parties, except the Genesee Conference, excepted to and appealed from the decision of that court. The material facts appear in the opinion of the court.

*H. R. Selden* and *D. H. Bolles*, for the plaintiff.

*A. G. Rice*, for the Chamberlain Institute, the Allegany College, and Genesee Conference.

*William H. Henderson,* for the Chamberlain Institute.

*John Ganson,* for Lucy Chamberlain, the widow.

Present — MARVIN, TALCOTT and DANIELS, JJ.

DANIELS, J. The plaintiff in this action is the brother of the testator, and, as such, entitled by descent and under the statute of distributions to inherit and participate in his real and personal estate, so far as it may prove not to have been lawfully and effectually disposed of by means of his will. No objection has been taken in the case to his right to maintain this suit, as an action in equity, for the purpose of procuring the determination of this court upon the validity of the devises and bequests made by the testator of his real and personal estate; and none, therefore, will be considered, in discussing the disposition which should be made of it. The will was made, and the testator resided, up to the period of his decease, and his estate was situated, within this State; and the validity of its provisions must, therefore, mainly depend upon the laws of this State. By those laws the testator was, in certain respects, limited and restrained in the disposition he was at liberty to make of his estate; and they applied to him in precisely the same manner, whether the disposition he designed to make of his property was intended, in whole or in part, for the benefit of natural and artificial persons existing within this State, or for those of other States or countries. Their restraints and limitations were imposed upon all wills made within this State, by persons domiciled therein, for the disposition of property situated here, without reference to, or qualification from, the circumstance that, in the execution of the devises or bequests made, the subjects of them were to be ultimately transferred to localities beyond its jurisdiction. The authority conferred upon the testator to dispose of his property by will was derived from the laws of the State in which he was domiciled at the time, and whose citizen he was; and, to render it valid, it was indispensable that it should be

Chamberlain *v.* Chamberlain.

made and executed, and dispose of the testator's estate, in conformity to those laws. So far as that has been done, it should be and must be sustained; but wherever it may be found to transcend the restrictions imposed by those laws, it as directly and necessarily follows that it must be condemned.

The principle referred to, as maintaining this result, has been regarded as so well-established as not practically to require the citation of authorities for the purpose of sustaining it, and but few will, therefore, be referred to for that object. (1 Jarman on Wills, 3d Am. ed., 3–12, also note to p. 4, and cases there cited; 2 Greenl. Ev., § 668; 1 Redf. on Wills, 2d ed., 398, 399, § 9; Story on Conflict of Laws, 5th ed., § 479.) And it will be found to have been relied upon and applied by the Court of Appeals of this State, under circumstances nearly similar to those presented by the present case, in *Dodge* v. *Pond* (23 N. Y., 69, 76, 77); *Levy* v. *Levy* (33 id., 97, 124–130, 136, 137); and *Bascom* v. *Albertson* (34 id., 584, 586, 587). See also, to the same effect, *Wood* v. *Wood* (5 Paige, 596, 603), and *Schultz* v. *Dambman* (3 Bradf., 379).

The first, and among the most important, respects in which it is claimed that these restrictions have been violated, relate to the devise and bequest made for the benefit of the Allegany College, situated at Meadville, in the State of Pennsylvania. By those, the testator devised and bequeathed his real and personal estate to his executors, and authorized and empowered them to sell the same and convert it into cash, and, after satisfying certain particular legacies of minor importance, he directed them to divide the proceeds into two equal parts, and pay one of such parts to the Centenary Fund Society of the Erie Annual Conference of the Methodist Episcopal Church, to be by said corporation invested and kept permanently invested, and the interest and income thereof used and expended by said corporation for the benefit of the Allegany College, at Meadville, Pennsylvania, in such manner and for such specific purposes as said corporation shall direct.

The Centenary Fund Society, the immediate legatee of this bequest, was, at the time when the will was made, and also at the testator's death, a benevolent or charitable corporation, created by, existing under the laws of, and located in, the State of Pennsylvania. The purpose, object and business of its incorporation, as they were declared and defined by its charter, were to secure the appropriation of funds for " the charitable purposes of the relief and sustenance of the traveling preachers attached to " the Erie Annual Conference of the Methodist Episcopal Church, " who may be distressed, worn out or superannuated, their wives, widows and children, and for the support of liberal education, under the direction of said conference." This corporation was to be, and, from anything to the contrary appearing in the case, was composed exclusively of those members of the Erie Annual Conference who were citizens of the State of Pennsylvania, and such lay members of the Methodist Episcopal Church within the jurisdiction of the conference, and who were citizens of the commonwealth, as the society should from time to time appoint upon its board of trustees. That board consisted of nine members — five clergymen and four laymen. And it was provided by the charter that the society, in its entire action, should carry out the intentions and wishes of the Erie Annual Conference in the execution of the offices and purposes already referred to. .

By an act of the legislature of the State of Pennsylvania, which became a law on the 6th day of March, in the year 1860, the capacity of the society to take, hold and use property, was so far increased as to render it capable of taking, receiving and holding, " all, and all manner of lands, tenements, rents, annuities, franchises and hereditaments, and any sum or sums of money, and any manner and portion of goods and chattels, to be employed and disposed of according to the objects, articles and conditions of the instrument upon which the corporation was formed and established, provided, that. the clear yearly income of the real and personal estate so held, should not exceed at any time the sum of $10,000.

The other half of these proceeds was directed to be paid by the executors to the Chamberlain Institute, which was an academical corporation existing in the county of Cattaraugus. This institute was originally incorporated by means of a charter granted by the regents of the university, under the provisions of the Revised Statutes conferring that power and authority upon them. The name given to it upon its incorporation was that of the "Randolph Academy." This was afterward changed to that of the "Chamberlain Institute," by an act passed and taking effect as a law, on the 11th of April, 1860.

These two legacies, together with two others in remainder, one to the Centenary Fund Society, and the other to the Genesee Conference of the Methodist Episcopal Church, which together cannot exceed the sum of $8,000, constituted more than one-half of the testator's real and personal estate remaining after the payment of his debts. And as the Genesee Conference, if incorporated at all, was a benevolent or charitable corporation, it is claimed, that they are unlawful so far as they exceed that proportion of the estate under the act of April 13th, 1860. This act provided, that "no person having a husband, wife, child, or parent," should by his or her last will and testament, devise or bequeath to any benevolent, charitable, literary, scientific, religious, or missionary society, association or corporation, in trust or otherwise, more than one-half part of his or her estate, after the payment of his or her debts, and such devise or bequest shall be valid to the extent of one-half and no more." (Vol. 4, Gen'l. Stats., 504, § 1.)

This statute, literally construed, only prohibited the testator from devising and bequeathing more than one-half of his estate to any one of the societies, associations, or corporations referred to. But that was manifestly not the purpose or design intended to be accomplished by means of its enactment. The reason inducing the law is rendered apparent by the circumstance, that it was made applicable only to those persons having one or more of the relatives mentioned in it.

The object was to prevent the testator from devising and bequeathing more than half his property to the societies, associations and corporations mentioned, for the purpose of benefiting and protecting his relatives, who might be regarded as possessing some natural claims for their support upon his bounty. No other reason could have existed for limiting the restriction to the class of cases where the testator had one or more of the relatives designated. And that being the design and object of the law, it would be defeated altogether by a construction of it, which would permit the testator to bequeath and devise all his estate to such societies, associations and corporations, provided he took care to give no more than one-half the amount to any single one of them. There would be neither sense nor propriety in such a statute; for the reason that would justify a testator in giving all his property to two of them, should equally protect him in giving it to one, where that might, to that extent, secure his disposing approbation. No complaint was ever made that unjust discriminations were made by testators in this respect, in the disposition made of their property. But the complaint was made, and it was a growing one, that testators were often in the habit of devising and disposing of their estates in favor of these institutions, to the injury and impoverishment of those who were naturally dependent upon them for their support. And it was to protect what was deemed an abuse in that respect, that this statute must have been passed. The fact that other corporations, associations and societies were not included, is in no way in conflict with this conclusion. For they were not, and are not, so frequently, or to such an extent, made the recipients of private property as to render legislation necessary for their exclusion, in order to secure the natural claims of the testator's relatives. But those of the description designated in the statute have often been found exerting an influence and control over the mind and conduct of the testator of so decided a character as to entirely extinguish the obligations arising out of the ties of blood and marriage. This statute was designed

Chamberlain *v.* Chamberlain.

to counteract that influence, to the extent, at least, of one-half of the testator's estate, remaining after the payment of his debts. And, in construing it, the spirit should be followed, for the purpose of securing the object the legislature had in view. This is a general rule of construction, required to be applied in all cases where the letter fails to clearly express the evident object and purpose of the law. (*People* v. *Utica Ins. Co.*, 15 John., 358, 380 ; *Tonnele* v. *Hall*, 4 Cow., 140, 144, 145; *Harris* v. *Slaght*, 46 Barb., 470.)

This statute should, therefore, be held to include the corporations mentioned in the testator's will, if the Chamberlain Institute can be properly held to be a literary corporation. The statute under which it was incorporated contemplated that it would be a school or seminary of learning; and it is not denied but that was, and continues to be, its character. In this respect it was of the same nature as colleges, the incorporation of which was provided for by the immediately preceding provisions. (2 R. S., 5th ed., 75–79.) And both were rendered subject to the same restrictions and regulations, by the general provisions adopted for their government. (Id., 78, 79.) When certain trust powers were afterward conferred upon them, they were provided for as literary institutions. That was clearly the case as to colleges; and, as academies belong to the same general class, they must have been designed to be included under the phrase, used in the statute, of "other literary incorporated institution." (3 R. S., 5th ed., 16, 17, §§ 56, 62.) The last section but one of the act changing its name sustains the same conclusion, by providing, in effect, that its funds shall be applied to the studies of literature and the fine arts. (Vol. 1, Laws of 1866, 1125, § 7.) And its own answer averred it to be a literary incorporated institution. No serious reasons exist for doubting the propriety of including this institute within the language of the act of 1860, as a literary corporation ; and that would have the effect of invalidating the testator's will, so far as, by devises and bequests otherwise unobjectionable, it bequeathed more than

one-half his property, remaining after the payment of his debts, to the corporations mentioned in it.

For the purpose of determining the mode in which the proportion lawfully disposable to these corporations should be ascertained, it is only necessary that the provisions contained in the statute should be briefly referred to. That deals with the testator's estate precisely as it may be found at the period of his own decease. The statute has provided what deductions shall be made from it, in order to apply its own provisions to it; that is, the debts of the testator. They are to be paid out of the estate; and, after that, no more than one-half the residue can be devised or bequeathed to the corporations, associations and societies designated. For the purpose of ascertaining the extent of the estate, the value of the widow's dower must, first of all, be deducted from it. That can constitute no part of the husband's estate. The law confers it upon the widow, as her property, over which her husband has neither power nor control. He may extinguish it by a provision made for his widow in lieu of it; but, until that shall be accepted by her, it can have no effect in the way of diminishing his estate. Her title as dowress must, therefore, necessarily continue until her acceptance, either actual or constructive, of the provision proposed by her husband in her behalf, in lieu of her dower; and, whenever that may be done, it must, for the purposes of this act, take effect upon the testator's estate from that period of time. The provision made for that purpose is in no just sense a debt of the testator, within that term, as it has been used in this statute; and, for that reason, its value should not be deducted for the purpose of ascertaining the extent of his estate at the period of his decease. The deductions authorized are limited to that portion of the estate that may be required to pay the testator's debts, and, by implication, exclude everything beyond that, in determining the amount he may devise to the corporations, societies and associations mentioned. So far as the testator attempted to exceed the restriction imposed by the statute, his will was invalid, within the express terms made use of.

It was valid to the extent of the half of his estate he was permitted by its language to devise and bequeath; but not beyond that.   If the two bequests particularly considered could both be carried into effect according to the terms of the will, to the extent of one-half the testator's estate, the value of the small bequests already mentioned, provided for the Genesee Conference and the Centenary Fund Society, respectively, by way of remainder, should be first deducted from the fund or proceeds out of which the will provided they should be made.   And, as thus reduced, one-fourth of the estate of the testator left after the payment of his debts would be all that could be claimed by either of the legatees for which those legacies were provided.

But it is claimed that the legacy provided for the Centenary Fund Society, for the benefit of the Allegany College, cannot be lawfully taken by the legatee, even to that extent. For the terms by which the testator attempted to provide for it bequeathed it in trust to the Centenary Fund Society, while that society, by its charter, has no power to take property in trust for another corporation; and, if it had, it could not lawfully take any portion of that provided for it by the will, because the trust declared would have the effect of producing an unlawful suspension of the power of absolute ownership.

The Allegany College has, at all times, been a distinct, independent and separate corporation from the Centenary Fund Society.   It was incorporated by an act of the legislature of Pennsylvania, approved on the 24th of March, 1817, for the education of youth in the learned, ancient and modern languages, in the liberal arts and sciences, and all useful literature.   The name given to the corporation was that of " The President and Trustees of Allegany College;" and by that name it was rendered competent and capable, at law and in equity, to take for the use of the college any estate in lands, tenements and hereditaments, goods, chattels, money or effects, by gift, grant, bargain, sale, assurance, devise or bequest, not exceeding in the whole the yearly value of $15,000.   And it

was further provided, by its charter, that a misnomer of the institution or corporation should not defeat, annul or destroy any gift, grant, devise or bequest, provided the intent of the party should sufficiently appear. The business of the corporation was placed under the charge and management of a board of trustees, upon whom ample powers were conferred for that purpose.

From this statement of the provisions of the charter, it very clearly appears, that the corporation, for whose benefit the legacy was proposed by the will to be given to the Centenary Fund Society, had full power and capacity to take the interest designed for it. And if the bequest had been direct and absolute to the college itself, no doubt can be entertained that it would have been entirely valid in law and equity, so far as it should prove to be unaffected by the act of 1860, which has been already considered.

But the bequest made for the use of the college was not of that character. For its interest in it was limited to that which beneficiaries are entitled to claim in trusts created for their benefit. That the bequest was designed to create a trust for the benefit of the college, is clearly apparent from the terms in which it was made. For, by them, the fund bequeathed was to be paid to the Centenary Fund Society, and invested by it, and the interest and income only were to be used and expended for the benefit of the college. And even that was to be done, not as the latter might dictate or require, but in such manner and for such specific purposes as the Centenary Fund Society should direct. These provisions of the will clearly contemplated the creation of a trust by means of the bequest they referred to; and they were amply sufficient for that purpose. (2 Story's Eq. Jur., § 964; Hill on Trustees, 3d Am. ed., 99–101; *Trustees, &c.,* v. *Hart*, 4 Wheat., 1, 27.)

Whether the Centenary Fund Society had power to accept a bequest made for such a trust, may now be properly considered. By the terms of its charter it is clear that no such power was intended to be conferred upon it. For that provides that its property should be used for the purposes men-

tioned in the preamble to that instrument; and those were, the relief of the distressed, worn-out, or superannuated travel- ing preachers attached to the Erie Annual Conference, their wives, widows and children, and the support of liberal educa- tion, under the direction of the conference. By these terms, whatever property the society should acquire was to be devoted to the objects specified, under the direction of the conference itself. This was rendered entirely certain by another provision in the charter, providing that the society, in its entire action, should carry out the intentions and wishes of the Erie Annual Conference, as set forth in the preamble to its constitution. The effect of these provisions was to place it under the com- plete direction and control of the conference, in all its trans- actions for the disposition of its property. And, in that respect, they were entirely inconsistent with the duties appertaining to the administration of this trust; for that was to be managed, and its income disposed of, under the directions given by, and contained in, the will of the testator.

But it is claimed that the society could accept and man- age this trust, under section 2 of an act passed by the legislature of Pennsylvania on the 8th day of April, 1833. This section, however, does not contemplate the imposition of the duties of a trustee upon the society for the benefit of a different and distinct body corporate. It renders this society capable of taking property bequeathed to it, to be employed and disposed of according to the objects, articles and condi- tions of its charter or by-laws, or of the will and intention of the donors. This confers no such powers upon the society as is claimed under it for that body. But-it confers the power merely of taking the property which may be bequeathed to it, not in trust for the benefit of another, but for its own benefit and to be appropriated to its own purposes. The object of the section was to create the capacity to receive and hold property to promote the ends of its incorporation, and not to erect it into a trust company for the benefit of institu- tions and individuals engaged in the business of liberal edu- cation. This is rendered still more apparent by the first

section of the act, passed by the same legislature, on the 6th of March, in the year 1860, which was enacted for the special purpose of defining and declaring the capacity of this and another similar society to take and hold property. By that, the capacity of the society in that respect was expressly restricted to property to be employed and disposed of according to the objects, articles and conditions of the instrument upon which it was formed and established, provided that the yearly income of such property should not exceed the sum of $10,000. This section is directly in conflict with the supposition that the society has the power to accept and manage the trust now under consideration, for it places the society's property where its own charter in terms had placed it, under the exclusive direction of the Erie Annual Conference, and it may properly be deemed to have superseded the provisions made by the act of 1833.

These statutes and all the provisions found in the charter of the society relating to that subject are inconsistent with the conclusion that the Centenary Fund Society was intended to be invested with the power to accept, hold and discharge the duties of a trust for the exclusive benefit of another distinct and independent corporation, even if that was engaged in the general business of education. There was no necessity of conferring that power upon the society for the benefit of educational corporations of this college, for they as well as this college are always provided with ample authority to take and hold all the property that can be required for their prosperity and use. And if the society could accept and discharge the duties of a trust for the benefit of that organization, it had authority to do the same thing for every one of the educational corporations that should be found within the limits of the State under whose laws it existed, for the yearly income to which it was restricted was plainly intended for such property only as under the act containing restriction was to be employed and disposed of according to the objects, articles and conditions of its charter. It certainly could not have been intended that this society should have any such

power, and yet it must have it, if it can receive and administer the trust provided for by this bequest. As there is nothing in the statutes referred to, nor in the charter of the society, giving it this authority, it cannot be deemed to possess it, for it is not essential to the proper use or enjoyment of any of the corporate powers and duties provided for or enjoined upon it. (*Jackson* v. *Hartwell*, 8 John., 422; Matter of Howe, 1 Paige, 214.) If this conclusion is sound, and no good reason appears to exist for doubting its correctness, then the bequest in question was invalid on account of the incapacity of the Centenary Fund Society to accept and administer the trust. For although it is a general principle in equity that a trust shall not fail for want of a competent trustee to take it, that principle is inapplicable to the present case. The trust attempted to be created by this will required the income of the fund to be used and expended in such manner and for such purposes as the Centenary Fund Society should direct, and that intrusted it with a discretion which it would be impossible for any other trustee to exercise. It was the judgment of that corporation which the testator provided should be exercised upon the subject, and of no other body or person whatsoever. And for that reason a court of equity can have no power to appoint a trustee in place of the corporation, which it now appears was incompetent to accept the trust. (*Beekman* v. *Benson*, 23 N. Y., 298; see also *Sherwood* v. *Am. Bible Society*, 1 Keyes, 561, 566–7.)

But if this bequest should not be held to be invalid, on account of the incompetency of the trustee to accept and administer the trust, then the further inquiry arises whether it is not invalid, on the ground that its execution would unlawfully suspend the absolute ownership of the fund. The statute upon this subject provides that: "The absolute ownership of personal property shall not be suspended by any limitation or condition whatever, for a longer period than during the continuance, and until the termination of not more than two lives in being at the date of the instrument containing such limitation or condition; or, if such instrument

be a will, for not more than two lives in being at the death of the testator." (3 R. S., 5th ed., 75, § 1.) This statute by its express terms, was evidently intended to annul all provisions contained in wills, executed under the laws of this State for the disposition of personal property, so far as they should be found in conflict with its prohibition. And no reason can exist for supposing that it was designed to tolerate or permit such a disposition to be legal and valid, when it might be made in favor of a corporation or citizen of another State, while it should not be if the recipient of the bounty was a corporation created by the laws of this State, or an individual residing under its protection. Such a discrimination would be both unreasonable and unjust. And no good ground exists for supposing that it was intended to be permitted by the legislature. The bequest in question is clearly within the disability imposed by this section of the statute. For the fund provided by it was to be kept permanently invested, without any limitation whatever in point of time, and the interest, or income, used and expended for the benefit of the college for which the investment was required to be made. Neither the Centenary Fund Society, nor the Alleghany College, in the execution of the trust, have the power at any period of time, no matter how remote that may be, to use, or expend a single dollar of the principal of the fund. But it is required to be perpetually maintained as an investment for the sole and only purpose of yielding its income for the use and benefit of the college. If such a trust could be enforced by law, there would be no period in the future, when either the trustee or the beneficiary would be at liberty to use or dispose of the principal, or any portion of it. A circumstance so incompatible with the rights appertaining to the absolute ownership, as to clearly show its indefinite suspension. (*Yates* v. *Yates*, 9 Barb., 343; *King* v. *Rundle*, 15 id,, 140.) The trust thus provided for, was one which not only might prolong the period of absolute ownership beyond the duration of two lives in being at the testator's death, but it was necessarily and inevitably pro-

ductive of that result.   Under this statute, no suspension of absolute ownership in personal property can be legally provided for, unless it be measured by lives, and then, in the case of a will, it must be limited to not more than two, and they must be designated, and in being at the time of the death of the testator.  (*Levy* v. *Levy*, 33 N. Y., 124–5–6.)

The bequest of one-half the remainder of the fund given by the testator to his widow for life, in favor of the Centenary Fund Society, is invalid, for the same reasons.   That was to be received upon trusts, differing in some respects from the one already considered.   But the fund itself was required to be similarly invested without any limitation in point of time.   This investment was to be made and maintained by the legatee in trust, the Centenary Fund Society. But its income, or interest, was required to be annually paid over to the superannuated and worn-out preachers belonging to the Erie Annual Conference, as that conference might direct.   The superannuated and worn-out preachers of the conference, were not necessarily members, or entitled to the benevolent support of the Centenary Fund Society.   For the Erie Annual Conference was composed of the traveling preachers of the Methodist Episcopal Church in eight counties in Ohio, two in the State of New York, and the western counties of the State of Pennsylvania, while the Centenary Fund Society included only such members of the conference as were citizens of Pennsylvania, and such lay members of the Methodist Episcopal Church within the jurisdiction of the conference, and citizens of the commonwealth, as the society should from time to time, appoint on its board of trustees.   The trust was designed for such superannuated, and worn-out preachers, as belonged to the conference, whether they were members of the Centenary Fund Society or not.   It was for that reason strictly, a trust for other persons, and other objects than the society was incorporated to promote, and for the reasons already given was invalid. Even if it could be so far sustained, as it contemplated the aid and assistance of the superannuated and worn-out

preachers of the Centenary Fund Society alone, if the trust had been made divisible, that circumstance can be of no ser- vice in the way of sustaining the bequest as it was made, for no means are afforded by which the trust can be apportioned. No line can be drawn which will separate the legal from the illegal portion of the entire bequest.

The other half of this fund in remainder was, by the terms. of the will, bequeathed to the Genesee Conference of the Methodist Episcopal Church, " to be safely invested ; and the interest accruing thereupon to be paid over to the superannu- ated and worn-out preachers belonging to said conference annually." No evidence can be found in the case establishing the fact that the Genesee Conference was ever incorporated. But the court has found, as a fact, that it was incorporated by chapter 189 of the Laws of 1819, page 237. That act, how- ever, does not sustain the conclusion that the Genesee Confer- ence was incorporated. It certainly was not by that act; for that merely incorporated the seven persons named in it, and their successors, as a corporation, called " The Trustees of the Funds of the Genesee Conference." It provides that they and their successors shall be a body corporate and politic, and that there should forever afterward be seven trustees of the corpo- ration. Vacancies in the offices of the trustees were required to be filled by the Genesee Annual Conference, and a certifi- cate of the appointment signed by the president and counter- signed by the secretary of the conference, and registered in the books of the said corporation; upon which the person or persons named were to become trustees of the corporation. The trustees were empowered to elect from their own number a president and secretary, and were required to elect the first officers for such offices before the next meeting of the Genesee Annual Conference. The trustees, or a majority of them, were also authorized to make by-laws, rules and regulations for the government of the corporation, or regulate the number of trustees who should constitute a quorum for the dispatch of business. Whenever they should deem it proper to sell . or dispose of any of the real and personal estate of the cor-

poration, it was made their duty to make a representation in writing to the itinerant ministers and preachers of the Genesee Conference at their next annual meeting; and if two-thirds of the number in conference assembled agreed to the sale, the president and secretary of the conference were required, by their certificate, to certify the fact; and upon that being transmitted to the trustees, and by them recorded in the books of the corporation, the sale might be made by it. In addition to these provisions, it was declared that the trustees, by the corporate name designated, should have succession, be capable of suing and being sued, have a common seal, change the same at pleasure, and be capable of taking, purchasing, holding and conveying, both in law and equity, any estate, both real and personal. This act throughout distinguishes between the conference and the corporation created by it. Their powers, officers and objects appear to be different; and the only respect in which the corporation is made dependent upon the conference are in the appointments to be made to fill vacancies occurring in the board of trustees, and the restraint imposed upon them in the sale of their corporate property. And the certificates made upon the determination of the conference upon those subjects are, before they can be properly acted upon, to be registered in the books of the corporation. No intention to incorporate the conference is exhibited by the act; but the design was to form a corporation for the purpose of promoting the wishes and objects of the conference. Even the persons who were to be appointed by the conference on the board of trustees were not required to be members of the conference, but simply itinerant preachers of the Methodist Episcopal Church of the preceding five years' standing, and at least twenty-five years of age.

That the bequest in question was designed for the conference itself, and not for the corporation, is very clearly indicated by the circumstance that the income of the fund bequeathed is directed to be annually paid over to the superannuated and worn-out preachers "belonging to said conference." No description of the corporation, either by name or

otherwise, is given in the will, and no reason is therefore disclosed for supposing that the corporation, and not the conference, was designed to be the recipient of the testator's bounty. And it is only when the corporation shall be sufficiently described to ascertain it to have been the testator's intention to give his property to the corporation that a misnomer of it can be disregarded. If this bequest must be regarded as made to the conference, then, as there is no evidence of its incorporation, it must fail for want of capacity in the legatee to take it. (*Owens* v. *Missionary Society, &c.*, 14 N. Y., 380; *Trustees, &c.*, v. *Hart,* 4 Wheaton, 1.)

But if it be held that the corporation itself was intended by the testator to take the bequest, the legatee will be no better off; for it was not designed that it should take it for itself, or for the members of its own body. If the corporation, as distinguished from the conference, should take the bequest, it must do so qualified by the obligation declared in the will, to invest it, and pay over the annual interest of the fund to the superannuated and worn-out preachers belonging to the conference. This necessarily would create a trust for the benefit of those preachers, and one in its duration unlimited by any assignable period of time. There would be no practical difference in the effect of the bequest by which it could be distinguished from the other half, the fund intended for the Centenary Fund Society. The investment required to be made would produce an unlawful suspension of the absolute ownership of the principal of the fund, and for that reason render the bequest void within the terms of the statute already mentioned. In this respect these bequests differ from that which was sustained in the case of *Sherwood* v. *Am. Bible Society* (1 Keyes, 561). No trust whatever was there attempted to be created. And from *McDonogh's Ex'rs* v. *Murdock* (15 How. U. S., 410), where the unlawful restraints upon the alienation of the property were rejected as void under a provision allowing that to be done, contained in the civil code of Louisiana.

So far as the bequest made to the Chamberlain Institute can be sustained, it stands upon different statutory provisions, applicable, by their terms, only to educational corporations existing, and incorporated under the laws of this State. By that bequest the testator directed the executors to pay one of the two parts into which he directed the final residue of his estate to be divided to the trustees of that institute, to be by them permanently invested in bonds and mortgages upon productive farming lands in this State, and to be kept so invested permanently, and the interest and income thereof to be received by them, to be by them used in the payment of the salaries of tutors and professors by them employed to teach in the institute, and in purchasing books and apparatus for its library. As the interest and income of this fund was to be used only in discharging a portion of the legitimate expenses of the institute, it may very well be that the direction of the testator concerning the investment of it would fail to create such a perpetuity as would render it obnoxious to the prohibition of the statute relating to that subject. For it was substantially a gift of so much money to the institute for its own use, and the directions for its investment might therefore be regarded as repugnant to the gift, if they were to be deemed peremptory in their character. (*Williams* v. *Williams*, 4 Selden, 525.) But, however that might be, the gift was certainly valid under the statutes at that time existing and applicable to this institute as a literary corporation. For, by those statutes, it was provided that, "Real and personal property may be granted and conveyed to any incorporated college or other literary incorporated institution in this State, to be held in trust for either of the following purposes: 1. To establish and maintain an observatory. 2. To found and maintain professorships and scholarships.    *    *    * 4. For any other specific purposes comprehended in the general objects authorized by their respective charters. (3 R. S., 5th ed., 16, § 56.) And devises and bequests for the same purposes were authorized and provided for by another act passed in the succeeding year. (Id., 17, § 60.) This

bequest was within these statutes, and as such was valid, even as a trust; for, by the statute under which the institute was incorporated, the trustees are made the corporation and the legal owners of its property. (2 R. S., 5th ed., 76, 77, §§ 58, 60, 62.)

As the bequest itself was one which the institute was empowered to accept under the terms contained in the will, the question now arises whether it was valid to the extent provided for by the testator. For the purpose of considering this point, the other corporate bequests should be laid entirely out of view, so far as they prove to have been inoperative and void. To that extent they are not bequests of the testator's property, and tend in no degree to diminish the corpus of his estate. They stand precisely the same as though the testator had entirely omitted them and all reference to them. For the law has done just that for him by pronouncing them illegal. And if that be their character, they are necessarily, totally and completely so. There would be a manifest incongruity in holding them void as to the legatees intended to be benefited by them, and at the same time valid for the purpose of reducing another legacy, which, so far as the act of 1860 is concerned, would have been perfectly lawful if no mention had been made of them. If void for any reason, they are entirely so for all purposes whatsoever.

The act of 1860 requires no construction inconsistent with this conclusion. For the bequests which are to be reduced according to its terms are such as if it were not for its existence, would constitute valid dispositions. Of the testator's estate, the statute deals only with what, if it were not for its own prohibition, would be lawful bequests and devises, and renders them valid to the extent of one-half the estate, notwithstanding the fact that in other respects they might have been entirely legal and proper. If the other corporate bequests had been out of the way, it would have been perfectly competent under this statute for the testator to have bequeathed one-half the residue of his estate to this institute in just the terms

made use of by him in his will.   And as the law, by declaring
those bequests void, adjudges that to be the character of the
instrument executed by him, the same legal result should
clearly follow.

This construction does not in any view increase the legacy
cequeathed to the institute beyond the extent to which the
testator designed to provide for it.   But it leaves it as he has
declared it, so far as it might otherwise have been affected by
the act of 1860.   It leaves the institute to take it, just as it
has been provided, if it shall prove to have the legal capacity
to do so.   By that act it could only be reduced, because it
would require more than half the estate of the testator after
the payment of his debts to satisfy it.   But as the others are
void, it can produce no such effect.   The reason for applying
the act to this part of the case has wholly ceased to exist.

This institute was incorporated under that portion of the
Revised Statutes, which, by implication, forbids corporations
formed under its provisions from either taking or holding by
gift, grant or devise, any real or personal property, the clear
yearly income or revenue of which shall exceed the value of
$4,000.   The authority to take and hold to that extent is
conferred upon such a corporation, and that is all the
authority given to it in that respect.   (2 R. S., 5th ed., 77,
§ 62, sub. 4.)   As that was the extent of the authority con-
ferred for that purpose, it was necessarily to be implied that
it should have no power to take and hold property beyond
that amount.   (Angell & Ames on Corporations, 4th ed., §
152.)   The enumeration and specific creation of that power
must have been intended to exclude the supposition that any
greater amount of property could be either taken or held by
the corporation, whose creation was then provided for.   Upon
this subject KENT states the settled rule of law to be, " to
consider corporations as having such powers as are specifically
granted by the act of incorporation, or as are necessary for the
purpose of carrying into effect the powers expressly granted,
and as not having any other."   (2 Kent, 7 ed., 343–5.)   And
this will be found fully sustained by the authorities he :as

cited in support of it.  The terms used by the statute in the present instance are much stronger than those usually employed for the purpose of defining corporate capacity to take and hold property.  It has been commonly the case, that the acts of incorporation have provided that property could be held for certain designated objects, or to a certain specified amount.  And the adjudged cases will be found to have been disposed of upon the effect of such provisions.  In those instances it is clear, that no restraint was imposed upon the powers of the corporation to take title to property; the prohibition to be implied, extending only to the power to hold as distinguished from the ability to take. This disqualification was properly held not to limit the corporate power to take.  For at common-law, corporations had indefinite power to take, hold, and dispose of property, where no actual restraints were imposed upon them by positive legislation.  (2 Kent, 313–14, Marg., 281.)  And that principle remained unaffected, so far as the power to take was concerned, by a mere inability to hold.  It was accordingly held by the courts, that the corporations affected could take title to property to an indefinite extent, notwithstanding the legislation alluded to; but that as between themselves and the State, they could not hold beyond the amounts specified by their charters, or other statutory authority affecting their capacity in that respect.

In the present instance, the restraint is of a different character.  For the same limit is imposed upon the capacity to take as is prescribed for that of holding.  Under that legislation, it must have been designed to impose the same restraint upon both the power of holding and taking.  There was no reason why the legislature should intend any discrimination in that respect.  No useful purpose could be promoted by allowing these institutions to take title to property, which it was plainly designed they were not to be at liberty to hold as between themselves and the public authorities of the State.  And no reason can well be imagined, why the legislature should intend to confer such authority upon them.

Chamberlain v. Chamberlain.

On the contrary, the rational supposition must be, that they were to be permitted to take only to the extent which they could lawfully hold the property to be taken. The object of the law was the promotion of commendable and useful results, by means of the use and appropriation of property. And for that purpose the power to take and hold it, must have been designed to be precisely the same in its extent. If it was not, then the term "take," as it was made use of in the statute, is entirely devoid of all meaning, and that is a consequence always to be avoided in the construction of laws. For it is to be presumed, that it was made use of to accomplish a purpose that could not have been as well promoted without it. There would be no propriety in declaring that the corporations intended to be limited in their powers by this provision, should take and hold to the extent mentioned, if it was only intended that they should not hold beyond it. For the latter purpose could have been much more intelligibly attained by a simple prohibition of the power of holding.

But even if a corporation of this description might, by the application of the doctrine of estoppel, be held to take title beyond the specified amount under a grant, or bill of sale, for which an actual consideration should be paid, the present bequest, so far as it may prove to be in excess of the statutory limit, cannot be aided by that principle. For it is a mere donation, or benefaction, which has not even passed into its corporate hands. And there would be a manifest impropriety in this court, as an equitable tribunal, if it were by its judgment to direct the executors to pay over such excess, when it could be seen that the corporation had not the power to hold and enjoy it as between itself and the State, but only the power to withhold it from the testator's next of kin.

The acts of 1840, 1841, and 1846, do not expressly repeal the limitation imposed upon the power of this corporation to take and hold property. And nothing is contained in either of them so directly in conflict with it, as to do that by implication. For these corporations may take property by gift,

grant, devise, or bequest, for any and all the purposes mentioned in those statutes, and accumulate their funds as provided by the act of 1846, without transcending this limitation.. There is nothing, either in the laws, or in the case that would warrant the conclusion, that the clear annual income of $4,000 would prove insufficient for the purpose of attaining all the objects mentioned in the statutes referred to. And under that state of the case there can be obviously no conflict between the earlier and later enactments. When these statutes were enacted the legislature must be presumed to have had the former statutes relating to these bodies all before them, and to have been conversant with their provisions and the effect of them, and, as no express repeal was enacted of any of them, to have intended that they should all continue in force and still be applicable in their restraints to these corporations, so far as they should not prove to be absolutely inconsistent with the laws afterward made. (Sedgwick on Statutory Law, &c., 126–128; *Borden* v. *Lease*, 5 Hill, 221, 225–6.) If the prescribed restraint is not to be sustained, then there can be no limit upon the amount of property these corporations can take for the purposes mentioned in the acts of 1840 and 1846. It can only be limited by the generosity of the donors and the extravagant visions of its recipients in the way of lavish expenditures. There is nothing whatever in the act of 1866, which changed the name of this corporation, evincing any disposition to remove the restraints imposed upon it by the subdivision previously mentioned. (Laws of 1866, vol. 1, 1124–5.) And in consequence of the incapacity to take the bequest in question, produced by that restraint, it should be reduced to such a sum as, on lawful interest, would produce the yearly income mentioned in the statute. This there will be no difficulty whatever in doing, because the bequest is to be paid by the executors to the trustees in cash.

The remaining portion of this controversy involves the rights of the testator's widow. He devised and bequeathed certain property to her, part of it in fee and the rest for life,

and .afterward added that " the provisions herein made for my said wife shall be in lieu of dower, and if she accepts the provisions herein made for her she shall not be entitled to dower in my property, and she shall not be entitled to receive any other share or interest in my estate." After the decease of the testator and on the 22d day of April, 1868, the widow executed an instrument, in and by which she accepted the provisions which the testator had made for her by his will. And beyond what was required for that purpose, the instrument executed by her contained the following clause : " And I do hereby renounce, release and forever discharge the said estate, every part thereof, and the executors of the said last will and testament, and the devisees, legatees, heirs and next of kin of the said Benjamin Chamberlain, of and from all interest, claim, right, dower and distributive share in or to said estate, and every part thereof, as widow of the said Benjamin Chamberlain, or otherwise, except as to the provisions made for me in the said last will and testament." The instrument also contained a statement, declaring that she elected to accept and receive the provisions made for her in full satisfaction of all share, interest and claim in or to the estate of her husband.

At the time when the widow executed this instrument she was in her seventieth year, and, as the evidence tended to show, considerably affected by nervous debility. The evidence also tended to show that she consented to execute an instrument electing to take the provision made for her by the will, and that one should be prepared for that purpose. That the one executed was afterward produced as having been drawn for the purpose of carry-ing that understanding into effect. And, under the supposition that such was its character, it was executed for her, and by her direction, by a member of her household. The court found, as a fact, " that she executed said instrument, supposing it to be a mere election to take under the will ; and, as to the other and remaining provisions therein contained, they were incorporated and inserted in said instrument against

her will and without her knowledge, and that she executed the
same in ignorance that they were embraced therein." The
evidence given upon the trial warranted this conclusion, which
was sufficient to establish the fact that, to this extent, the
widow had been fraudulently imposed upon. For it is a fraud
for one person, to whom the duty of reducing an instrument
to writing may be intrusted, for the purpose of embodying in
it a certain agreement or understanding, to insert additional
stipulations prejudicial to the other party, and afterward pro-
duce it for execution, with the assumption that it is merely the
instrument mutually intended to be made, and secure the
execution of it by the other party under that conviction.
(*Botsford* v. *McLean*, 45 Barb., 478, 486–489.) And it was
also held by this court, in the unreported case of *Annabal* v.
*Brown*, decided by the General Term of this district, in Sep-
tember, 1864.

The court, at Special Term, set this instrument entirely
aside; and, although it is not expressly stated to have been
done on account of this fraud, yet, as that conclusion appears
to have been essential to the judgment pronounced, and it was
supported by the evidence, that may reasonably be presumed
to have been the ground on which the decision proceeded.
(*Jones* v. *Emery*, 40 N. H., 348.) For the presumption in
support of the judgment is, that all the facts essential to its
correctness have been found by the court pronouncing it, so
far as evidence was given upon the trial tending to establish
their existence.

Assuming that this instrument was properly annulled, then
the question is presented, whether the widow is not entitled
to participate in the distribution of the personalty, so far as
the testator may prove to have died intestate, on account of
the illegality of some of his bequests, even though she may
not have entered upon the lands to be assigned to her for her
dower, or commenced proceedings for the recovery or assign-
ment thereof, within one year from the time of her husband's
death. (3 R. S., 5th ed., 32, § 14.) The solution of this point
must depend very much upon the general scope, tenor and

Chamberlain *v.* Chamberlain.

language of the will; for in this, as in all other respects, it is the object of the law to render the intention of the testator effectual, so far as that may be found to be consistent with the established principles of law. And, in its consideration, the election of the widow, even though it may have been constructively made, by lapse of time, under the provisions of the statute, must necessarily have the same effect that it would have had if it had been made through the instrumentality of a formal and solemn instrument. For, however made, when made at all, it is, in legal contemplation, an election to take according to the terms of the will to which it may relate. (4 Kent, 7th ed., 57, 58, note *c;* Jarman on Wills, 3d Am. ed., vol. 1, 378, 379; *Havens* v. *Sackett,* 15 N. Y., 365.)

For the purpose of ascertaining the intention of the testator upon this subject, his language must be construed in view of the circumstances under which it was used. And they exhibit his purpose to have been to make a complete and effectual disposition of his entire estate through the instrumentality of his will, and he undoubtedly believed he had accomplished that result. If he had been successful in the execution of that design, his widow would have necessarily been compelled to have received the provision made in her behalf in lieu of all other interest in his estate, upon her acceptance of it under the terms of the will. Had that been the legal, as it clearly was the theoretic, nature of the instrument, the clause referred to would certainly have been attended with that result, in the event of her acceptance. But as it was not, it cannot fairly be presumed that he intended that it should govern a new and unforeseen combination of circumstances materially changing the direction he had given concerning a large portion of his estate. It was a declaration made in conformity with the disposition he believed he had lawfully made of his property, and applicable only to the state of facts then in his mind, and it should accordingly be limited to them as most in harmony with his purposes. This construction is suggested by the language made use of, when considered in the light afforded by the circumstances existing when it was employed, and the

objects which the testator designed to accomplish by means of his will. And it is sanctioned by the authority of the thoroughly considered case of *Pickering* v. *Stamford* (2 Vesey, 272, 581; 3 id., 331, 492). This case, though sharply criticised, seems to have been generally regarded, both by the legal profession and the text writers, as having been well decided. (1 Jarman on Wills, 394, 395; Williams on Executors, 3d Am. ed., 1278–9; Dayton on Surrogates, 3d ed., 560.) If serious doubts concerning its accuracy had been entertained, it is altogether probable that it would long before this have been found to have been questioned by courts of justice, for the point is one that it is not unreasonable to suppose must have frequently arisen since the time when that decision was made. The doctrine of that case clearly harmonizes with the provisions contained in the statute of this State concerning the distribution of personal estates. For that peremptorily requires that the surplus of the testator's personal estate remaining after the payment of debts and legacies, if not bequeathed, shall be distributed to the widow and next of kin of the deceased. (3 R. S., 5th ed., 183, § 82.)

It is not intended to be denied but that the widow might have renounced this right, as she might that secured by any other statutory provision in her favor; but to do that required the voluntary execution of some instrument, or the performance of some act unequivocally evincing that to be her design. The testator might also have required that to be done as a condition of her accepting the provision contained in her behalf in the will, and then the acceptance of one would necessarily have required the performance of the other. But that he did not deem it proper to do, for he imposed no condition whatever upon her in case she elected to accept the testamentary provision made in her behalf, To deprive her of her right to participate in the distribution of the portion of his estate which by any possibility might fall within the terms of the statute, certainly required something showing that he at least contemplated that event as a possible contingency, and had some design to provide for its govern-

Chamberlain *v.* Chamberlain.

ment.    He entirely failed to do that in the present instance.

The judgment should be so far modified as to declare the bequest intended for the Genesee Conference inoperative and void, and the interest proposed to be affected by it to be distributable to the next of kin after the widow's death, and the bequest made to the Chamberlain Institute to be limited to such an amount as will yield the yearly income of $4,000, provided that shall not require more than one-half the testator's estate remaining after the payment of his debts and the deduction of the value of the widow's dower.    If it should still exceed such half, then it must be further reduced, so that it can in no event exceed that proportion of the estate.

As so modified, the judgment should be affirmed, with costs to each of the parties, to be paid by the executors, out of the funds in their hands belonging to the estate.

TALCOTT, J.    I am of the opinion that the bequest " to the Centenary Fund Society, of the Erie Annual Conference of the Methodist Episcopal Church, to be by said corporation invested, and *kept permanently invested*, and the interest and income thereof used and expended for the benefit of Alleghany College, at Meadville, Pennsylvania, in such manner and for such specific purposes as said corporation shall direct," is void, because it is an attempt to suspend the absolute ownership of personal property, for a period which does not necessarily determine, at the expiration of two lives in being, at the death of the testator. (1 R. S., 773, § 1.)    And neither the trustee nor *cestui que trust* is an "incorporated college, or other literary incorporated institution in this State," which corporations are excepted out of the provisions of the act against perpetuities by the statutes of 1840, chapter 318, and 1841, chapter 261.    Since the doctrine that donations, devises and bequests may, by the courts, be excepted from the positive and clear prohibitions of our statutes concerning uses and trusts, and in restraint of perpetuities, upon the idea that the purpose of the proposed use, trust or perpetuity, is benevo-

lent or charitable, has been, as I conceive it to have been, fully and finally exploded in the court of last resort (*Bascom v. Alderson*, 34 N. Y., 584), we are to apply the same rules to cases of that nature as to any other attempt to create a trust or perpetuity; as, for instance, if the testator has bequeathed the fund to a named individual upon the trust to hold the principal forever, and appropriate the income to the support and maintenance of the testator's posterity through all time. The absolute ownership of property is suspended where there is no person or corporation who can absolutely and unconditionally alienate and transfer it, subject to no condition or limitation whatever. Where the use of the property is limited, there the ownership is not absolute, but qualified. If the bequest of the testator could be carried into effect, then the principal of the fund in question would be absolutely inalienable for all time. This is an attempt to suspend the absolute ownership of the fund, and, in my judgment, contravenes the provisions of the statute referred to.

The bequest to the trustees of the Chamberlain Institute is valid because that corporation is one of those which are embraced in the aforesaid statutes of 1840 and 1841, and is authorized to take, hold and execute trusts within the purview of the objects of its charter, and to continue for such time as may be necessary to accomplish the purpose for which the trust is created.

The bequest of the residue of the sum of $8,000, in case any should be undisposed of by the wife of the testator during her life, or by last will and testament, to the Centenary Fund Society and the Genesee Conference, contained in the fourth clause of the will is void, for the same reason that invalidates the principal bequest to the Centenary Fund Society, viz.: That it is an attempt to create perpetuities, not covered by the acts of 1840 and 1841. I think the learned justice who disposed of this cause at the Special Term was in error in supposing that the "Genesee Annual Conference" was incorporated under the 189th chapter of the Laws of 1819. Certain persons and their successors, were thereby

incorporated under the corporate name of " The Trustees of the Funds of the Genesee Conference," upon the application of a " committee appointed by and on behalf of the Methodist Episcopal Church belonging to the Genesee Annual Conference," with power to the conference to nominate and appoint future trustees as often as vacancies should occur, the appointment to be evidenced by a certificate of the president and secretary of the conference, the certificate to be registered in the books of the corporation.

The act furthermore provides that the trustees shall not sell, charge or encumber the property of the corporation, except upon the consent of the two-thirds of the itinerant ministers and preachers of the conference, at their next annual meeting, who, if they agree to it, shall transmit a certificate, to be signed by the president and secretary of the conference, to the trustees to be recorded in the books " of the aforesaid corporation hereby created."

Waiving the question whether the misnomer is of any importance, it appears that the corporation was created to take charge of the funds to be raised " for the purpose of assisting the itinerant, supernumerary and superannuated ministers, their wives and children, belonging to said conference," and the bequest of the testator is to pay over the interest to the superannuated and worn-out preachers belonging to the conference.

There is nothing in the act of incorporation, or in the terms of the will, bringing the bequest within the provisions of the acts of 1840, and 1841. The bequest is, therefore, even if concededly made to a corporation entitled to take and hold for the objects of its incorporation, within the prohibition of the statutes against perpetuities, and for that reason inoperative and void. If I am correct in the conclusion at which I have arrived, to be stated in a subsequent part of this opinion, that notwithstanding what has happened, the widow of the testator has the legal right to reject, as she attempts to do, the provisions of the will made for her benefit in lieu of her dower, and all other claims upon the estate ;

then these two contingent bequests are also inoperative, for the reason that the amount of them, and the time when they are to take effect, are so entirely dependent upon the acceptance by the widow of the provisions made for her by the will, that it is impossible to ascertain or carry out the intention of the testator as to the two bequests referred to, in the event which has happened, of the rejection by her of the provision made for her benefit by the will.

The justice, at the Special Term, adjudged the instrument to which Eliza Pierce signed the name of the widow, Mrs. Lucy Chamberlain, by her direction to be void. From this disposition of that instrument, I am not disposed to dissent. The evidence tended strongly to show, that the instrument was executed under circumstances of pressure, and perhaps some intimidation, in ignorance of her rights, by a sick and aged woman, who was misled and deceived as to the purport, effect, and purpose of the instrument, and I think the ruling of the Special Term on the subject, is abundantly sustained by the authorities applicable to such cases. The counsel for the plaintiff insists strongly that the evidence does not show that there was any fact, bearing upon the question of her election to take under the provisions of the will, which she did not fully understand. Certainly, there is no evidence to show that she fully knew even of what lands she was entitled to be endowed. On the contrary, Mr. Allen D. Scott, the attorney who presented and procured the execution of the instrument states, that he asked her in the interview during which he induced her to consent to the signing of the paper, what amount of real estate her husband had when he died, and she did not seem to know very precisely. Now, knowledge of the facts on this subject, was certainly of great importance to the free exercise of the right of election.

In the case of _Pasey_ v. _Desbouvrie_ (3 P. Wms., 315), a daughter of a freeman of London was by the custom of London entitled to an orphanage share, and her father's will provided a legacy of £10,000 for her upon condition she should release her orphanage share. After the death of her

father she accepted the legacy and executed a release. There was no fraud on the part of the brother who obtained the release, and she was informed that she had it in her election to have an account of her father's personal estate, and to claim her orphanage part, but she voluntarily declared that she would accept the legacy left her by her father, that being a sufficient provision for any young woman.

On this release being pleaded to a bill brought to set it aside, and for an accounting as to the orphanage part, the lord chancellor ordered the plea to stand for an answer, upon the ground that the release would not avail even in that case.

The case has been sometimes supposed to be an authority in favor of relief upon the sole ground of ignorance or mistake of law, but Mr. Justice STORY says that it rests principally upon the ground that the daughter " acted under ignorance of facts; for she neither knew or had any means of knowing what her orphanage share was when she made her election. (Story's Eq. Jur., § 118.)

I think, however, that the learned justice at Special Term erred in holding as a matter of fact, that the widow had not entered upon the lands to be assigned to her for dower, or commenced proceedings for the recovery or assignment thereof, within a year after the death of her husband, and, as a conclusion of law, that she was deemed therefore to have elected to accept the devises and bequests contained in the will in lieu of dower. It would seem from the findings of fact that it would be for the interest of the widow to allow the decision at Special Term on this subject to stand, inasmuch as by that decision she became entitled to retain the lands devised to her in fee, found to be worth $8,250, and to the $8,000, all of which she was entitled to use at a rate not exceeding $1,000 per year, with the absolute power of disposition of any residue by will, and to her distributive share of the personality by reason of the failure of the void bequests. But she has appealed from this part of the decision, and it is for her and her counsel to determine which course is for her interest. She having presented the question, it must be determined according to law.

The testator died February 10th, 1868. In September, 1868, the widow commenced a suit in this court against the plaintiff, the executors, and residuary legatees, setting forth the circumstances under which the instrument, purporting to be an election to accept the provisions of the will in lieu of dower and other claims, was obtained, and asking that her "rights in the property, real and personal, of the said estate might be declared and settled," "and for such other and further relief as should be just and agreeable to equity." The pleadings in that action are not set forth in this case; but the findings of fact admit that the action commenced by her was as set forth and described in her answer, and the answer states that the action was commenced to declare her rights in the estate as "the widow" of the testator, and as we have seen the prayer of the complaint specifically embraced her rights in the real property to which she had no right except as dowress, independent of the provisions of the will given her in lieu of dower, and the election to take which she was by that action seeking to set aside.

The statute referred to by the findings is, that the woman entitled to an election between jointure or provision by will in lieu of dower "shall be deemed to have elected to take such jointure, devise or pecuniary provision, unless within one year after the death of her husband she shall enter on the lands to be assigned to her for her dower, or commence proceedings for the recovery or assignment thereof. (1 R. S., 742, § 14.) By the statute (2 R. S., 265, § 24), writs of dower were abolished, and actions of ejectment to be brought after the expiration of six months from the time the widow's right accrued were substituted, so that taking the two statutes together her right to elect, so far as an action at law is concerned, is limited to the last six months of the year succeeding her husband's decease. Considering that this election by inaction is to be applied to women, not generally well acquainted with their rights, often having no legal adviser, except such as the heirs or executors employ, with so short a time for acquiring the information necessary to enable them

to act understandingly, and most likely, ignorant of the means and modes of access to that information, certainly it is a statute somewhat harsh in its provisions and to be most liberally construed in favor of the widow.

An action of ejectment, as ordinarily understood, was not the appropriate action in this case. The instrument which she sought to set aside stood in the way of such an action.

The equitable jurisdiction of the court must be resorted to, to set that instrument aside, before any recovery could be had in an action of ejectment; and I have little doubt but a bill in equity to set aside a written election, in which bill the widow should reject the provision made by will in lieu of dower, and ask to have her rights as to the real property of which her husband died seized declared and adjudged, *as widow*, and not as devisee or legatee, must be held to be within the just construction of the words, "proceedings for the recovery of" dower, as contained in the statute under consideration.

But I am of the opinion that the action commenced by the widow in this case, was a proceeding for the recovery of dower in a more technical sense. It was an action in equity, and one which, before the Constitution of 1846, would have been commenced in the Court of Chancery. Now, it is well-settled that the Court of Chancery had concurrent jurisdiction with courts of law for the recovery and assignment of dower. The jurisdiction was originally asserted in cases precisely like the one presented here, where there was some impediment to proceeding at law, and where the interposition of equity was needed to remove the impediment; and, in such cases, the court retained the case, not only to remove the impediment, or grant the discovery, but for final and effectual relief by the assignment of dower. Afterward (*Mundy* v. *Mundy,* 2 Ves., Jun., 122), it was decided that a bill for dower was maintainable, without alleging any impediment at law. (*Badgley* v. *Bruce,* 4 Paige, 98.) According to the findings in this case, as to what the pleadings in, and the objects of, the action by the widow were, I have

no doubt it will be competent for the court, in the exercise of its ordinary jurisdiction, not only to set aside the instrument which purported to be an election, but to retain the case for the other and further relief of assigning the dower to the plaintiff. It follows, therefore, that so much of the decree in this case as adjudges that the said Lucy Chamberlain is deemed to have elected to accept the provisions in her behalf, contained in said last will and testament, in lieu of dower, must be reversed, and the decree, as modified, must declare that the said Lucy Chamberlain, as the widow of the testator, is entitled to her dower in the real estate of which the testator died seized.

I am of the opinion that the bequests of the testator to the Centenary Fund Society, the Chamberlain Institute, and the Genesee Conference, so far forth as they would have operated to bestow upon the legatees in the aggregate more than one-half of the entire estate of the testator, would, to the extent of such excess, be inoperative under chapter 360 of the Laws of 1860.

It seems to me, the plain intent of that act was to deprive a testator, leaving behind him the natural claimants upon his bounty, specified in the act, of the power of bestowing by will more than half of his estate, after payment of his debts, upon such associations or corporations as are described in the act, and not to provide simply that, although he might distribute his entire estate among such corporations and associations, he should give no more than one-half of it to any one of them.

I cannot see the purpose of any reference to the fact of the testator's having a wife, child, &c., if the object was simply to provide for a distribution of his estate among various corporations, instead of giving it to one alone. The fact that a testator has a wife, child, &c., has no sort of reference to, or bearing upon, the question whether he should bestow his property upon one or upon many corporations. (*Harris* v. *Slaight*, 46 Barb., 470; *S. C.*, on appeal, 4 Abb., N. S., 421.)

But I do not see how that question can arise in this case, since the only valid bequest to such corporations or associations

as are specified in the act of 1860 is that to the Chamberlain Institute, which cannot exceed the one-half of the testator's estate, as it is a bequest of only one-half of a residue. The other bequests to such corporations and associations being void, the bequest to the institute stands alone, no other bequests to such corporations or associations as are mentioned in the act having, in judgment of law, been made, but the testator having died intestate as to that portion of his estate which he attempted to bestow upon the other corporations.

The decree below limits the amount which the Chamberlain Institute can take under the bequest to it, to one-fourth part of the estate. According to the argument of one of the counsel for the plaintiff, this limitation seems to have been fixed upon the idea that, as the testator was restrained by the statute from bequeathing more than half of his estate to the Centenary Fund Society, and the Chamberlain Institute collectively, the statute is to be imported into the will, and the bequest to be read as though it had been of one-half of his estate, and no more, to the two corporations a moiety of such half to each; I think this position is not sound.

The testator seems to have been ignorant of the act of 1860, or at least to have disregarded its provisions, because it would seem from the findings at the Special Term, that the residuary bequests contained in the eighteenth clause of the will, if valid, would carry more than one-half of the estate. Moreover, if the testator had in his mind the statute of 1860, and it is to be considered as written in the will, and expresses his intention, we must also hold, that he was equally well acquainted with the law by which the attempted bequests to the Centenary Fund Society is rendered inoperative and void, and knew that the bequest of one-half the residue to the Chamberlain Institute would stand alone. I think, therefore, that so much of the decree as limits the bequest to the Chamberlain Institute to one-fourth part only of the fund attempted to be created in and by the eighteenth clause of the will should be reversed.

I am of opinion also, that in estimating the value of one-half of the estate for the purposes of the statute of 1860, the value of the dower right of the widow should be deducted. This dower interest could not be disposed of by the testator, and constituted no part of his estate.

The remaining question is, whether the bequest to the Chamberlain Institute is valid for any excess beyond an amount, the clear yearly income of which shall not exceed $4,000 ? This institution was originally incorporated by the regents of the university, under article 3 of title 1, chapter 15, part 1 of the Revised Statutes.

By a special act passed in 1866, the name was changed to that of the "Chamberlain Institute," and a visitorial power with the right to nominate and appoint thirteen trustees, was conferred upon the Erie Annual Conference of the Methodist Episcopal Church, with the provision that such trustees "shall constitute the board of trustees of said institute, with all the powers and duties of trustees of academies as now provided by law."

By the act defining the general powers of corporations, any corporation is authorized "to hold, purchase and convey such real and personal estate as the purposes of the corporation shall require, not exceeding the amount limited in its charter," and it is further provided that in addition to the powers enumerated in the first section of the same title, and to those expressly given in its charter, or in the act under which it is or shall be incorporated. "No corporation shall possess or exercise any corporate powers, except such as shall be necessary to the exercise of the powers so enumerated and given." (1 R. S., 599–600, § 103.)

By the statute under which the trustees of the Randolph academy were incorporated, their right to "take and hold by *gift, grant or devise* any real or personal property," is limited to an amount "the clear yearly income or revenue of which shall not exceed the value of $4,000."

There is no difference in the power of the institution to take and hold by grant or devise. If, therefore, a devise to it

of property, producing a yearly revenue of more than $4,000 is void *pro tanto*, so would be a grant, and the executors, heirs-at-law, next of kin and widow in this case stand in the same position as would the testator, if in his lifetime he had conveyed to the institute property, producing more annual revenue than the amount specified, and brought an action to recover back the excess, in opposition to his grant.   I do not think such grants are void or voidable in behalf of private persons.   It may be that if a corporation is absolutely forbidden to purchase or take lands, as stated in Angell & Ames on Corporations, that a deed of lands made to it would be void.   (Angell & Ames on Co., § 152.)   It is observable, that the language in Angell & Ames is that, " if a corporation be forbidden by its charter to *purchase or take.*"   In support of the proposition the authors cite only the case of *Leazure* v. *Hillegas* (7 Serg. & R., 319).   The opinion in the case referred to sustained the conveyance, as against the action of ejectment of a party claiming under the grantor, and on the subject under consideration the court say (at page 320) : " The restriction is, that the bank shall not *purchase and hold.* *Purchasing and holding* are different things, and the consequences of each are very different.   If the words had been, that the bank should neither purchase, nor hold, then it could have done neither the one nor the other.   But although *purchasing and holding* might have been thought dangerous, because of the power which it would have given the bank to bring too much land into mortmain, yet to *purchase* subjects to the statutes of mortmain, which authorized the commonwealth to appropriate the land to its own use, could be attended with no danger.   This construction would satisfy the jealous policy of the legislature, preserve the community from the danger of too great a mass of real property held in mortmain, and at the same time put it in the power of the commonwealth to act toward the bank as justice might seem to require."

The language of the statute, under which the institute was incorporated, is, that it may "*take and hold*" only so much

as will produce a revenue not to exceed $4,000 per annum ; which is, in effect, a prohibition against "*taking and holding*" a greater amount, and not against taking *or* holding, illustrating the precise distinction made by Judge TIGHLMAN in the case cited.

This restriction in the act is not for the protection of individuals, against being induced to grant or devise a greater amount of property to such a corporation, but is founded upon the principle of the mortmain acts, and was designed to protect the State and the community against the accumulation of too much of the property of the country in mortmain. And a construction of the act which leaves the sovereign power at liberty to interpose and rescue from the "dead hand" any excess of property which it may have accumulated, fulfills the intention and answers all the purposes of the act.

In *Humbert* v. *Trinity Church* (24 Wend., 587), decided in the Court of Errors, where it was claimed that the corporation was incapable of acquiring title to certain lands in consequence of the fact that its annual income exceeded the limit allowed by its charter, Senator FURMAN, delivering one of the leading opinions, after showing that it did not appear, that, at the time the church was alleged to have acquired the title to the property in question, it had an annual income exceeding £500, proceeds to say (page 630):

"But there is another respect in which it may be regarded, which is equally fatal. This restriction is a mere question of governmental policy, and individuals, as such, have nothing to do with it, and no control over it; and the utmost that can be said about it is, that the title of the corporation is perfectly good as to the whole world even, if it should exceed that restriction in its annual rents; and it is not, for that reason, *void*, but only *voidable*, at the instance of the supreme power."

In *Bogardus* v. *Trinity Church* (4 Sandf. Ch., 633), where the same restriction was urged upon the court, the vice-chancellor says (page 758): "Secondly. If, when the church

acquired the title, whether it were in 1705, or at the end of sixty years from their entry under the grant, the income were, in fact, more than £500, no private persons could take advantage of the fact. It is a question between the corporation and the sovereign power, in which individuals have no concern, and of which they cannot avail themselves in any mode against the corporation." These cases show, I think, that such restrictions upon the powers of corporations as to the amount of property they may take and hold, are simply in the nature of mortmain acts; and that a gift, devise or grant to a corporation so restricted, exceeding the amount of the restriction, is not void, but voidable. And where the prohibition is against "taking and holding," and not against each separate act, the corporation may take in excess of the restriction, but cannot hold as against the State. (See Shelford on Mortmain, 34.)

As late as 1833, a commission, in the nature of a writ of inquiry of office, was issued under the great seal in England to inquire whether The University Life Assurance Society empowered to "purchase and hold lands," &c., not exceeding in value the annual sum of £1,000, had accumulated lands yielding a greater annual value, and, on the finding of the jury, the commissioners seized the lands in excess as forfeited to the crown (note E, page 10, Shelford on Mortmain). The mortmain acts, technically known as such, related to lands, tenements, &c. But I do not see why the same construction should not apply to acts founded on the same principle, which embrace also personal property.

Unless the words "gift, grant or devise," in the act under which the Randolph Academy, now the Chamberlain Institute, was incorporated, include the bequest in question, then the corporation was always unrestrained as to the amount of property it might take by bequest, except by the provisions of the statute relating to the general powers of corporations, which limits the amount it may "hold, purchase and convey" to that which "the purposes of the corporation shall require." I assume that the bequest in question is within the limitation

of the act under which the institute was incorporated, and upon the ground that the limitation is in its nature a mortmain act, and that by the act a gift or a devise are placed by the statute on the same footing as a grant. I hold that neither is void under that limitation; but may be avoided at the election of the State.

I am, furthermore, of the opinion that the restriction upon the class of institutions to which the Chamberlain Institute belongs, is removed by the acts of 1840 and 1841, before referred to. I concede that a legislative policy, so clearly evidenced by various enactments, as the mortmain policy of this State, is not to be overthrown except by direct repeal or *necessary* implication. But I think the acts of 1840 and 1841 and the statutory restriction in this case cannot stand together. The act of 1840, section 1, declares that " *all property* which should thereafter be granted to any incorporated college or other literary institution in trust for either of the aforesaid purposes, may be held by such college or institution upon such trusts, and subject to such conditions and visitations as may be prescribed and agreed to as aforesaid," and the act of 1841 puts devises and bequests on the same footing as grants. I do not see how an act saying that this institution may hold *all property* granted to it for certain purposes, can possibly stand with an act which says that the same institution shall not hold property for any purpose exceeding a certain amount. In my opinion, this presents the case of a repeal by *necessary* implication of the former and restrictive statute. I think, therefore, the decision at the Special Term on this point should be affirmed. The result of the foregoing views is that the decision of the Special Term, establishing the validity of the bequests in trust to the Genesee Conference, contained in the fourth clause of the will, should be reversed, and the contingent bequest in the same clause to the Centenary Fund Society should be declared invalid. The decision that the widow is barred of her right of dower, for not having entered or commenced an action to recover it within a year after the death of the testa-

tor, should be reversed, and she should be decreed not to have elected to take the provisions of the will in lieu of dower. And the decision limiting the amount, which the Chamberlain Institute is entitled to take, under the will, to one-fourth of the testator's estate after paying all his debts, should be reversed, and the decree of the Special Term as thus modified should be affirmed.

I do not intend to express any opinion in regard to the capacity of the Centenary Fund Society to take and execute such a trust as was attempted to be conferred upon it in this case, provided the trust itself did not conflict with the laws of the testator's domicil, except to say that in my judgment that question is to be resolved by the laws of Pennsylvania, where, according to the decision of the Supreme Court of the United States, in the Girard will case (2 How. U. S., 128), the doctrine of charitable uses, as existing before the statute of 43 Elizabeth, prevails. Neither do I intend to express any opinion in regard to the proposition relied upon by the counsel for the widow, to the effect that after a valid election to take the devise and legacy to her offered by the will in lieu of all her claims as dowress, and to a distributive share of the personal estate, she may, nevertheless, claim a distributive share of the personal estate not disposed of, by reason of the invalidity of the attempted trust, and also retain the entire provision offered to her as the price of all claims to both real and personal estate.

MARVIN, J., concurred with both the opinions in holding the bequest to the Centenary Fund Society for the benefit of the Alleghany College void, and in holding that the contingent bequests in remainder to the Centenary Fund Society and the Genesee Conference were also void. He also concurred with Mr. Justice TALCOTT in holding that the Chamberlain Institute was not restricted to such an amount of the bequest in its favor as would yield an annual income of $4,000 ; and he dissented from the conclusion that the widow was entitled

to her dower and her distributive share in the real and personal estate of the deceased husband.

The judgment of the Special Term was so far modified as to declare the contingent bequests to the Centenary Fund Society and the Genesee Conference void; that the widow had not elected to take the provision made for her by the will, and that she was therefore entitled to her dower in the testator's real estate, and to her distributive share of his unbequeathed personal estate, and that the Chamberlain Institute was capable of taking the entire interest bequeathed to it by the terms of the will. As so modified the judgment was affirmed, with costs to each of the parties out of the funds in hands of the executors.