IN THE MATTER OF THE ESTATE OF JOHN McGRAW, DECEASED, AND, ALSO, IN THE MATTER OF THE ESTATE OF JENNIE McGRAW–FISKE, DECEASED, WILLARD FISKE AND JOSEPH McGRAW AND OTHERS, APPELLANTS, *v.* CORNELL UNIVERSITY AND DOUGLASS BOARDMAN, EXECUTOR, ETC., RESPONDENTS.

*Appeal from a surrogate's decree — duty of the General Term to decide questions of fact — the powers of a corporation are limited to those specified in its charter — 2 R. S. (7th ed.), 1531, § 3 — charter of Cornell University — 1865, chap. 585 — limitation upon the amount of property it can take by will — the heirs-at-law and next of kin of the testator may contest its right to take in excess of the amount limited — right of the university to the " land scrip fund " and the " Cornell endowment fund " considered — value of its grounds and buildings — by what rule determined.*

Where an appeal is taken from a decree of a surrogate upon questions of fact the General Term of the Supreme Court has power, and it is its duty, to decide the questions of fact which were before the surrogate.

*Hewlett* v. *Elmer* (103 N. Y., 156) and *Davis* v. *Clark* (87 id., 623) followed.

Whatever may have been the rule at common law, under the Revised Statutes (2 R. S. [7th ed.], 1531, § 3), the powers of corporations are expressly limited to those specified in the statute or conferred by their charters.

Section 1 of the charter of Cornell University (chap. 585 of 1865) provides that the university " shall have all the rights and privileges necessary to the accomplishment of the object of its creation as declared in this act, and in the

performance of its duties shall be subject to the provisions, and may exercise the powers enumerated and set forth in the second article of the fifteenth chapter, title one of the Revised Statutes;" subdivision 4 of section 36, of which article empowers the trustees " *to take and hold*, by gift, grant or devise, any real or personal property, the annual income or revenue of which shall not exceed the value of twenty-five thousand dollars." Section 5 of the charter provides that " the corporation hereby created may *hold* real and personal property to an amount not exceeding three millions of dollars in the aggregate."

*Held*, that, in view of the provisions of the Revised Statutes to the effect that corporations have no powers beyond such as are awarded by the statute or the charter, it must be held that the corporation had no power to *take*, except what might be inferred from the right to *hold* conferred by section 5 of the charter, which is limited, or from the provision of the Revised Statutes, which was embodied in the first section, which was also itself limited.

*It seems*, that if the university has no power to *hold*, in excess of a certain amount, it has no power to *take* more than that amount.

*It seems*, that the expression " to hold" might have been used in the expectation that the university would, in preparing for and carrying out the object of its existence, make large expenditures, and for that purpose would from time to time require large sums, not for accumulation but for use and outlay; so that while the aggregate amount received might exceed the limit named, the amount, at any one time in fact in its possession, in money or property, would not.

Chapter 318 of 1840, as amended by chapter 261 of 1841, provided that real and personal property might be granted, conveyed, devised and bequeathed to any incorporated college or other incorporated institution in this State, to be held in trust for any specific purposes comprehended in the general objects authorized by their respective charters, and that all property which should thereafter be so granted might be held by such institutions upon such trusts. No limit was specified in these acts.

*Held*, that these acts were not in any sense repugnant to the general laws of the State limiting and restricting the amount or value of the property which can be taken and held by such institution, nor did they repeal, by implication, the previous restrictive statutes.

*Chamberlain* v. *Chamberlain* (43 N. Y., 424) followed.

It was claimed in this case that the power conferred by these acts was not restricted by the provisions of the article of the Revised Statutes, adopted by section 1 of the charter, as the rule on the subject of limitation was given by section 5 of the charter — that as such adoption is only to the extent that shall be necessary to " the performance of its duties" as a university, and as this power can exist consistently with the existence of the limitation on *holding* in section 5, that, therefore, the university could *take* property by devise, regardless of the charter limitation, but could only *hold* any excess over such limit with the consent of the State.

*Held*, that the claim could not be maintained.

That the heirs and next of kin of a testator giving property to the university, were entitled to take advantage of any transgression of the law, and assert and insist upon the limitation as a restriction upon the power of the corporation to take.

*Chamberlain* v. *Chamberlain* (43 N. Y., 424); *Church of Redemption* v. *Grace Church* (68 id,, 582) followed ; *Leazure* v. *Hillegas* (7 Serg. & Rawle, 319); *Jones* v. *Habersham* (107 U. S., 174); *De Camp* v. *Dobbins* (29 N. J. Eq., 36) distinguished and not followed.

There is a wide distinction between the present case and cases where there has been a grant to a corporation for a valuable consideration and the grantor seeks to avoid it on the ground that the power of the corporation to take is exhausted, or where the property has been used for purposes different from those allowed by the charter, or obtained when not necessary for its business, or cases where national banks have taken securities not authorized by the laws of their incorporation, as in these cases the element of estoppel would seem to be strongly applicable.

Upon an accounting by the executors of Jennie McGraw-Fiske before the surrogate, he found that at the time of her death, September 30, 1881, the Cornell University, to which institution she had devised the residue of her estate, held and owned real and personal property which it had derived from the founder or other friends, or which it had purchased with funds furnished by them or with the income of such funds, of the value of $598,588.55; that it also held and owned property derived from the State and nation to the amount and value of $2,088,012.78; made up of western land contracts, $439,834.22; and of western lands, $1,648,178.56; but that under and in pursuance of a contract made by the founder, Cornell, with the State, the avails of said last mentioned property was at that time due or payable to the State. He also found that the university had possession of the " Cornell endowment fund," amounting to $128,596.61, and that the State had possession of the " college land scrip fund," amounting to $473,402.87 ; but held that the property, at that time held and owned by the university, over and above its obligation to the State on the contract, did not exceed $598,588.65. The appellants claimed that all these classes of property were the property of the university within the meaning of the statutory limitation, while the respondents claimed that none were such property except the first.

All the property except that in the first class was derived from the land scrip given by the United States to the different States in certain amounts by an act of congress passed in 1862, which provided that the scrip should be sold by the States " and the proceeds thereof applied to the uses and purposes prescribed in the act, and for no other use or purpose whatever; " that the State should not be allowed to locate any land in any other State or territory of the United States, but that their assigns might locate the scrip upon any of the unappropriated lands of the United States, subject to sale at private entry, at one dollar and twenty-five cents or less per acre; " all money derived from the sale of the said scrip was to be invested as therein provided, to form a perpetual fund, which, with the exception of ten per cent of the amount

received by any State which might be devoted to the purchase of an experimental farm, should remain forever undiminished, the interest to be inviolably appropriated by each State which might claim the benefit of the act to the endowment, support and maintenance of at least one college where the leading but not exclusive object should be to teach such branches of learning as are related to agriculture and the mechanical arts. The act further provided, as a condition of the grant, that if any portion of the fund or of the interest thereon should by any action or contingency be diminished or lost, it should be replaced by the State, and also that "no portion of said fund, nor the interest thereon, shall be applied, directly or indirectly, under any pretense whatever, to the purchase erection, preservation or repair of any building or buildings."

Thereafter the State of New York, having accepted the grant, the legislature, y chapter 585 of 1865, inc orporated the Cornell University, and directed that upon compliance by it with the conditions therein contained the income and revenue which should be received from the investment of the proceeds of the sale of the land scrip should be appropriated and paid over to the trustees of the university for its use and behoof, in the mode and for the purposes in the said act of congress defined. The university having complied with the conditions prescribed in the act, the comptroller was thereafter authorized, by chapter 481 of 1866, to sell the land scrip at not less than thirty cents an acre, to the trustees of the university, or, in connection with the commissioner of the land office, to sell it to other persons, provided that said trustees or other persons should agree and give security to the effect that the whole net avails and profits from the sale of the scrip, or from the location and use of the said lands, or the sale of lands so located, should, from time to time as received, be paid over and devoted to the use of the university. On August 4, 1866, the State agreed to sell to Cornell the balance unsold of the land scrip, he to receive the same in parcels not less than 25,000 acres, and pay into the treasury of the State thirty cents an acre in money or certain securities, and at the same time to deposit certain securities equal to an additional thirty cents, to secure his agreement to purchase the whole scrip, and select and locate lands under it within four years and sell the lands within twenty years, and to pay into the treasury of the State the whole of the net profits to be ascertained as therein provided, out of which a portion equal to thirty cents per acre should be added to and form a part of the fund known as the "college land scrip fund," and the remainder should constitute a separate and distinct fund *which should "be the property of the Cornell University,* to be known as the 'Cornell endowment fund,' the principal of which shall forever remain unimpaired the income to be annually appropriated by the legislature and paid over from time to time to *the trustees of the Cornell University, to be by them devoted to the purposes of the institution."*

Prior to October 13, 1874, all the land scrip had been transferred under the contract to Cornell, who had sold a portion of the land, paid to the comptroller the additional thirty cents and the balance of the profits realized on the sale, and had located and still held the land for the balance of the scrip, 432,000 acres,

the thirty cents an acre due thereon being secured but not paid to the comptroller  On that day the university, with the consent of the comptroller and commissioners of the land office, took the deed of said lands from Cornell, assumed all his obligations in the contract, and paid the comptroller the first thirty cents an acre.  Of these lands there remained unsold at the death of the testator lands and contracts for the sale of portions thereof of the value, as found by the surrogate, of $1,648,178.56.

The legislature accepted the view of the State officers making this contract, who assumed that the profits that might arise from the transaction to the purchaser would not be a part of the purchase-price of the scrip, and were not, therefore, subject to the restrictions of the act of congress, and ratified the contract by appropriating the income of the fund to the trustees of the university in pursuance of the contract, after receiving reports of the comptroller, attorney general and a majority of a commission appointed to examine the question, that in their opinions the profits were a part of the price of the shares, and acting on the first mentioned view of the case, in 1880 passed an act by which the comptroller was directed to and did assign, transfer, pay and deliver all the moneys, securities, stocks, bonds and contracts known as the Cornell endowment fund, then held by the State for the use of the university.

*Held*, that the western lands and contracts, and the endowment fund held by the university on the 30th day of September, 1881, must be reckoned as a part of the property of the university under the limitation of its charter, subject, however, to the deduction of $129,600 due to the land scrip fund for the last thirty cents an acre on the 432 000 acres still unsold.

That the situation of the college land scrip fund held by the State was different, as the principal was a trust fund and did not belong to the university, and the income was received from time to time. not by virtue of an established perfected grant or gift but rather in consideration of the performance of continuous duties and services, and that the amount thereof should not be reckoned as a part of its property under the limitation of its charter.

In the list of property described as funds derived from the founder and other friends, and amounting to $598 588 65 is the following item:  "The farm and grounds on which the university buildings are located, consisting of about two hundred and sixty acres, including the buildings and reservoir, sixty nine thousand six hundred and eighty-three dollars and thirty three cents."  The buildings were conceded to be adapted to and necessary for the uses and purposes of the institution, and if destroyed would have to be replaced if the objects of the institution were carried out.  They were comparatively new were usually insured for about $400,000, the cost of erection having been in the neighborhood of $600,000.  The surrogate acted upon the estimates of the witnesses called by the university, which were based upon the value of the farm for use as a farm or for building lots, and the value that could be realized from the buildings for other than university purposes, and adopted as the rule for determining the value the amount of money into which the property could be converted for other than university purposes.

*Held*, that he erred in so doing

*Hollis Case* (95 N. Y., 178); *Betts* v. *Betts* (4 Abb. N. C., 317, 398) distinguished.

That the question was not what was the value of the property for the purpose of its division or distribution as part of an estate, but its value as property held, not for traffic or disposal, but for the purposes of the corporation.

That the grounds and buildings were held and used as an entirety, and that their value as a whole was the thing to be ascertained.

That, as the property had no market value, it would be competent to show the present cost of such buildings and the extent to which there had been deterioration; and that, assuming that the buildings were adapted to and necessary for the uses and purposes of the institution, the value would be substantially the present cost of the buildings, less the difference between new and old.

That, upon the assumption that the parties desired that this court should fix the value, on the evidence already in the case, it would fix it at $385,000.

That this sum, when added to the value of the other property of the university, exceeded the limit fixed by its charter

APPEAL from the decree of the surrogate of Tompkins county, entered upon the 25th day of May, 1886, "upon both the facts and upon questions of law."

The decree is based upon findings of fact and conclusions of law signed by the surrogate on the 25th of May, 1886. After making ninety five findings, classified as upon questions of fact, the surrogate found as conclusions of law as follows, viz : "I decide and hold as conclusions of law that Douglass Boardman, as executor of the last will and testament of Jennie McGraw-Fiske, deceased, and as sole surviving executor of John McGraw, deceased, and Cornell University are entitled to a decree directing :

(*a.*) That the accounts of Douglass Boardman, as executor of Jennie McGraw-Fiske, deceased, and as sole surviving executor of John McGraw, deceased, filed in the Tompkins county surrogate's office on the 8th day of January. 1883, be, and in all respects, allowed and the decrees, including the summary statements therein contained, recorded and entered upon said accounts, be in all respects ratified, and affirmed, including all payments heretofore made by said executor to Cornell University.

(*b*) That the said executor pay over to Cornell University the sum of one hundred forty-one thousand six hundred and seventy-six and seventy-two one hundredth dollars ($141 676.72), being the balance on hand January 1, 1885, and ready for distribution.

(*c*) And adjudging that said Cornell University is the owner and entitled to all the rest, residue and remainder of said estate,

and directing said executor to pay the same, when sold, to said Cornell University, in money or in such other form, or at such other time, as may be mutually agreed upon between said Cornell University and said executor."

Jennie McGraw–Fiske died an inhabitant of the county of Tompkins, in the village of Ithaca, on the 30th day of September, 1881, and her last will and testament was admitted to probate and the executor duly qualified thereunder. In the eighty-ninth finding of the surrogate there is a recapitulation made by the surrogate of her estate in the following language, viz. : " The total value of Jennie McGraw–Fiske's estate at the date of her death, September 30, 1881, real and personal, not including $250,000 trust fund, is $2,158,907.83 ; less $73,854.50, debts of John McGraw and expenses of his estate incurred or paid between September 30, 1881, and January 1, 1885, as above, leaves $2,085,053.33 ; less $59,119.87, debts of Jennie McGraw–Fiske, as already found, leaves $2.025,933.46, which sum, viz., $2,025,933.46, was the value of the estate of Jennie McGraw–Fiske at the date of her death, after the payment of her debts. One-half is $1,012,971.73. The individual legacies are $1,121,570 ; rejected but undetermined claims against John McGraw, about $75,000."

In his eighty-second finding he stated the legacies given by her, and that the same amounted to $1,121,570, all of which have been paid by the executor, "except the legacy of $10,000 to Henry Clement," the payment of which is, by the will, made discretionary with the executor, and which discretion has not yet been exercised in favor of the legatee.

In the seventy-fifth finding he stated that Cornell University, September 30, 1881, "had held and owned real and personal property which it derived from the founder and other friends of the university, or which was purchased with funds furnished by them, or with the income of such funds * * * of the value of five hundred and ninety-eight thousand five hundred and eighty-eight and sixty-five one hundredth dollars ($598,588.65) in the aggregate," and then stated a description of the property thus held, with a valuation set opposite each classification of property, and the final specification therein contained was the following words: " The farm and grounds on which the university buildings

are located, consisting of about 260 acres, including the buildings and reservoir, $69,683.33."

This last item was made the subject of considerable evidence before the surrogate. Apparently the surrogate adopted the evidence and the theories put forward with regard to the value of the property embraced in the last item by the respondents. The valuation of the appellants in respect to that item of property, as given by their witnesses and other sources of information, ranged between $670,000 or thereabouts, and $873,000 or thereabouts. It appears by the evidence that the university was carrying an insurance upon the buildings situated upon the real estate mentioned in the last item of over $400,000 on the 30th of September, 1881, and that the treasurer had stated the value of the buildings situated upon the farm lands and the value of the farm in his sworn report at upwards of $711,000, and that several other reports had been made by the authorities of the university, placing the valuation of the property in the neighborhood of $700,000.

In the ninety-third finding of the surrogate he states as follows, viz.: "The following is a recapitulation of the findings of fact relating to the property of Cornell University, viz.: September 30, 1881, Cornell University had held and owned the property derived from individuals and described in the foregoing seventy-fifth finding of fact, to the amount and value of not exceeding $598,588.65 in the aggregate.

At the same time Cornell University had held and owned the property derived from the nation and State, and described in the foregoing findings, to the amount and value of not exceeding $2,088,012.78 in the aggregate, as follows:

| | |
|---|---:|
| Western land contracts | $439,834 22 |
| Western land | 1,648,178 56 |
| Total | $2,088,012 78 |

But under and in pursuance of the Cornell contract of August 4, 1866, the whole net proceeds of the avails of said last mentioned property, being the proceeds of the sale of said college land scrip, or lands located therewith, was at that time due or payable by Cornell University to the State of New York, and the total amount

and value of the property had, held and owned by Cornell University, September 30, 1881, over and above its obligations to the State of New York, as defined by said contract, was $598,588.65. * * * At that time also Cornell University had possession of the Cornell endowment fund and the State of New York had possession of the college land scrip fund.

### TABULAR STATEMENT.

| | |
|---|---:|
| Funds derived from individuals described in seventy-fifth finding of fact............... | $598,588 65 |
| Funds derived from nation and State: | |
| Western lands............................. | 1,648,178 56 |
| Western land contracts...................... | 439,834 22 |
| Cornell endowment fund...................... | 128,596 61 |
| College land scrip fund...................... | 473,402 87 |
| | $3,288,600 91" |

And in his ninety-fifth finding he stated, viz: "It has not been proved or established that the property of the Cornell University, owned and held by it on the 30th day of September, 1881, the date of the death of Jennie McGraw–Fiske, together with that devised and bequeathed by her in her last will and testament to said university exceeded the sum of three millions of dollars." The general account presented by the executor was approved by the decree, and as no question has been made before us in respect thereto, except so far as it relates to the right of the university to receive the residuum of the estate of Mrs. Fiske under her will, it is not necessary to examine the account in detail. The accuracy, fairness and fidelity of the executor's accounts are not drawn in question by any discussion had either orally or in the printed briefs. His administration of the estates of John McGraw and of Mrs. Fiske seems to have been unquestionable and unquestioned, except so far as the provisions of the will and the law relating thereto are drawn into discussion. Some portions of the estate had been paid under the provision in the will to the university before any doubt or litigation arose in respect to its right to receive the same under the will. The voluminous case and exceptions purported to contain all the evidence taken by and proceedings had before the surrogate.

*George Sidney Camp,* for Thomas H. McGraw and others, devisees and legatees under the will of John McGraw, deceased.

*John G. Sears,* for heirs and next of kin of Jenny McGraw-Fiske, deceased.

*Charles P. Bacon,* for Willard Fiske.

*George F. Comstock* and *Esek Cowen,* for devisees, appellants.

*S. D. Halliday* and *E. Countryman,* for Cornell Unversity and the executor, respondents.

HARDIN, P. J. :

Section 2568 of the Code of Civil Proceedure provides that "any party aggrieved may appeal from a decree or an order of a Surrogate's Court in a case prescribed in this article ;" * * * and section 2570 provides that "an appeal to the Supreme Court may be taken from a decree of a Surrogate's Court, or from an order affecting a substantial right, made by a surrogate ;" * * * and section 2576 provides that "the appeal may be taken upon questions of law, or upon the facts, *or upon both.* If it is taken from a decree rendered upon the trial, by the surrogate, of an issue of fact, it must be heard upon a case to be made and settled by the surrogate, as prescribed by law for the making and settling of a case upon an appeal in an action."

In virtue of these sections the appeal in the case now comes before us for consideration upon the law and the facts, for it is provided in section 2586 that "where an appeal is taken upon the facts, the appellate court has the same power to decide the questions of fact which the surrogate had ; and it may, in its discretion, receive further testimony or documentary evidence and appoint a referee." And section 2587 provides that "the appellate court may reverse, affirm or modify the decree or order appealed from and each intermediate order, specified in the notice of appeal, which it is authorized by law to review, and as to any and all of the parties ; and it may if necessary or proper, grant a new trial or hearing," and section 2545 provides that "an exception may be taken to a ruling by a surrogate, upon the trial by him of an issue of fact, including a finding or a refusal to find, upon a question of fact, in a case where such

an exception may be taken to a ruling of the court upon a trial, without a jury, of an issue of fact, as prescribed in article third of title first of chapter tenth of this act." That section also provides for assimilating the practice to that which prevails in respect to a trial without a jury of an issue of fact in the Supreme Court, as well as in regard to the settlement of the case containing the exceptions, and that section also provides that "upon such a trial the surrogate must file in his office his decision in writing, which must state separately the facts found and the conclusions of law. Either party may, upon the settlement of a case, request a finding upon any question of fact or a ruling upon any question of law, and an exception may be taken to such a finding or ruling or to a refusal to find or rule accordingly."

These sections have recently been brought in review and construction given thereto by the Court of Appeals in *Hewlett* v. *Elmer* (103 N. Y., 156), and the rule laid down that that court will not review a question of fact depending upon conflicting evidence, but that the Supreme Court has the power and it is its duty "to decide the questions of fact which were before the surrogate," thus reaffirming the rule as stated in *Davis* v. *Clark* (87 N. Y., 623), and several other cases referred to in the opinion in *Hewlett* v. *Elmer*. Therefore, a review of the evidence, as given in the opinion of Mr. Justice MERWIN, in this case, is proper in this court; and as I concur in the conclusions of law stated in that opinion, as well as in his conclusions upon the facts, I must give my assent to a reversal of the decree of the surrogate. I think the decree should be reversed on the ground that Cornell University, at the time of the death of Jennie McGraw-Fiske, had reached the limit of its charter and was not entitled to take or hold any of the property or funds given to it by her will, and the proceedings should be remitted to the surrogate with directions to make distribution of the funds and property remaining in the hands of the executor, together with any advances and payments heretofore made by him to Cornell University, to the appellants according to their rights as they shall appear, with costs to the appellants, payable out of the fund.

MERWIN, J. :

The main contention of this appeal is over the question whether Cornell University had, on the day of the death of Mrs. Fiske, capacity

to receive the legacies given to it by her will. Whatever may have been the rule at common law (2 Kent Com., 281), under our Revised Statutes (2 R. S. [7th ed.], 1531, § 3), the powers of corporations are expressly limited to those specified in the statute or conferred by their charters. (*Halstead* v. *Mayor, etc.*, 3 N. Y., 433; *Riley* v. *City of Rochester*, 5 Seld., 64, 71.) In the Riley case it was held that a municipal corporation having power by its charter "to purchase, hold and convey any estate, real or personal, for the public use of said corporation," is not thereby authorized to hold lands beyond its boundaries to be used as a highway, and a conveyance to such corporation of lands beyond its boundaries for the purpose of a street is void, and this was held at the suit of one claiming apparently under the original grantor.

By section 5 of the charter of Cornell University (chap. 585 of the Laws of 1865), it is provided that "the corporation hereby created may hold real and personal property to an amount not exceeding three millions of dollars in the aggregate." This amounted to a prohibition against holding in excess of that amount. (*People* v. *Utica Ins. Co.*, 15 Johns. 383; *Crocker* v. *Whitney*, 71 N. Y., 167.) The claim of the appellants is that the prohibition against holding is, in effect, a prohibition against taking beyond the amount that can be held, and that the university at the time of the death of Mrs. Fiske, held and owned real and personal property up to its full limits, and as it can not hold any more it can not take any more. The claim of the respondents is (1) that the limitation against *holding* does not prevent its *taking* without limit as against everybody except the State; and (2) and that the university does not *hold*, within the meaning of the limitation clause of the charter any of the proceeds or avails of land scrip issued to the State of New York, under the act of congress (chap. 130 of the Laws of thirty-seventh congress, second session, approved July 2, 1862), and that, deducting such proceeds, the limits of its charter would not be exhausted by the entire bequests to it by Mrs. Fiske.

It is a well established principle that property not effectually disposed of by will passes to the heirs or next of kin, and this, too, although the failure of disposition arises from the incapacity of the party named as legatee to take. (*White* v. *Howard*, 46 N. Y., 144, 170; *McCartee* v. *Orphan Asylum Society*, 9 Cow., 438; *Van*

*Kleeck* v. *Dutch Church*, 20 Wend. 490.) This rule has been recognized and applied in numerous cases. (*Stephenson* v. *The Ontario Orphan Asylum*, 27 Hun 380.) In *Lynes* v. *Townsend* (33 N. Y., 561), it is said, "there must be an actual valid and effectual gift to some other definite object" in order to disinherit the heir. The same rule applies, though the failure of disposition arises from an incapacity of a corporate legatee, produced by its exhaustion of its power to take and hold as limited by its charter, although such limitation is said to be in the nature of a governmental regulation, and although the question of such exhaustion can be determined only by an investigation of the affairs of the corporation. (*Chamberlain* v. *Chamlain*, 43 N. Y., 424.) An individual whose interests will be affected by a transgression of the statutory limit may assert and insist upon the limitation as a restriction upon the power of the corporation to take. (*Church of the Redemption* v. *Grace Church*, 68 N. Y., 582.) The question, then, is, what is the nature and scope of the restriction on the university?

In the first section of its charter it is provided that the university "shall have all the rights and privileges necessary to the accomplishment of the object of its creation as declared in this act, and in the performance of its duties shall be subject to the provisions and may exercise the powers enumerated and set forth in the second article of the fifteenth chapter, title one, of the Revised Statutes of the State of New York." That article is "of the powers and duties of the trustees of colleges" and in section 36 it is provided that "the trustees of every such college, besides the general powers and privileges of a corporation, shall have power: 4. To take and hold, by gift, grant or devise, any real or personal property, the yearly income or revenue of which shall not exceed the value of twenty-five thousand dollars." This standing alone undoubtedly operated as an authority and a limitation, and would be so construed were there no other provision on the subject. Construing it in connection with section 5 of the charter already quoted, if *taking* and *holding* are to be deemed essentially different, then, strictly speaking, there was power to take an amount the yearly income of which shall not exceed $25,000, and power to hold an amount not exceeding $3,000,000 in the aggregate. But no such result was designed. The charter provision would control, which is not by way of additional power, but gives the whole rule on the subject, and the right

to hold $3,000,000 would necessarily draw with it the right to take sufficient to arrive at that amount. There would in that view be no opportunity for the inference that it could take without limit. That would be a power of such a character that it should be based on express language, or necessary implication to that effect. It would be at variance with the uniform policy of the State on that subject. There is nothing indicating a design on the part of the State to create an agency for the accumulation of property tor the State's benefit. Legislation to that effect would be an anomaly.

It may be said with considerable force that if the university has no power to hold, it has no power to take. If there is a restriction on the former, and still there be given or left, at the same moment, a full power to take, the restriction would be nugatory. For if one can take he must necessarily hold. So that if we should assume a design to produce an effectual restriction upon holding a restriction upon taking would necessarily follow. This was the view taken in the *Bank of Michigan* v. *Niles* (1 Doug. [Mich.], 401), where it was held .by the Supreme Court of Michigan that a restriction in the charter of the bank taking away the capacity to hold operated to take away the capacity to take. The action was for the specific performance of a contract to convey real estate. A similar doctrine seems to have been held by the Supreme Court of Missouri in a similar case. (*Pacific R. R. Co.* v. *Seely*, 45 Mo., 212.) But it is not necessary to go so far as that in order to sustain the idea of limitation on taking, unless the statutes of 1840 and 1841, hereinafter referred to, may affect the question. For in view of the provision of our statute providing that corporations have no powers beyond what are awarded by the statute or the charter, then it must be said that the corporation has no power to take except what may be inferred from the right to hold, which is limited, or from the provision of the Revised Statutes which is embodied in the first section and is itself limited. It is not entirely clear why the expression "to hold" is only used. Very evidently it might have been expected that the corporation would, in preparing for and carrying out the object of its existence, make large expenditures, and for that purpose would from time to time have to acquire large sums, not for accumulation but for use and outlay; so that the aggregate might exceed the limit named, but the amount at any one time in

fact, in possession, in money or property, would not. So that, in that view, the law in substance said to the corporation, whatever you may obtain you cannot at any one time hold beyond the named amount. If you do, you transgress the law.

But it is argued, on the part of the respondents, that under the provisions of chapter 318 of the Laws of 1840, as amended by chapter 261 of 1841, the university has full and unlimited power to take in the absence of any prohibition in the charter. By those acts it is provided that real and personal property may be granted and conveyed, devised and bequeathed, to any incorporated college or other literary incorporated institution in this state, to be held in trust for any specific purposes comprehended in the general objects authorized by their respective charters, and that all property which shall thereafter be so granted may be held by such institution upon such trusts. No limit was specified in those acts. The argument is that those acts operated to modify the provision of the Revised Statutes, prohibiting devises to corporations, and in effect conferred on the university, as a literary incorporated institution, the power to take by devise as well as by grant and bequest "all property" in trust for any specific purpose within the sphere of its corporate power under its charter; that this power is not restricted by the provisions of the article adopted by section 1 of the charter, as the rule on the subject of limitation is given by section 5, and as such adoption is only to the extent that shall be necessary to "the performance of its duties" as a university; and that this power can exist consistently with the existence of the limitation on holding in section 5, and it is, therefore, said that the university "could take the entire bequest given in the will, regardless of the charter limitation, but it could only hold any excess over such limit with the consent of the State." Perry on Trusts (vol. 1, § 45) is cited, where the rule is broadly stated: "If a corporation takes land by grant or bequest in trust, or otherwise, which by its charter it cannot hold, its title is good as against third persons and strangers; the State only can interfere." This rule, as well as the argument of the learned counsel, is based on a series of decisions, having their origin in the law held applicable to the English mortmain acts. Under these acts Green's Brices Ultra Vires, 10) it was held that alienations in mortmain, without license from the crown, were not

void so as to let in the grantors or their heirs-at-law, but there existed a right of forfeiture, which could only be taken advantage of by the superior lord or the king. (Shelford on Mortmain, 8, 34, 35.) This was on the theory that corporations without license from the crown had capacity to take, but not to retain. The same reason for the theory was given in *Leazure* v. *Hillegas* (7 Serg. & Rawle 319), where it is said that a corporation has, from its nature, a right to purchase lands, though the charter contains no license to that purpose. The Leazure case was an early and a leading one in this country, and was decided in 1821 by the Supreme Court of Pennsylvania, where the English mortmain laws were in force. The title of the Bank of North America to certain real estate, which it had purchased and conveyed, was in question. It had power to " purchase and hold " for certain purposes, but this purchase was beyond its power. It was held, following what was held to be the English rule in mortmain, that the bank could take the title defeasible, like that of an alien, only by the commonwealth, and that if it conveyed to a third person, without claim by the commonwealth, such third person holds the same estate defeasible in like manner. Many cases are cited where the Leazure case has been followed, but none like the case at bar, so far as we have observed, except the case of *Jones* v. *Habersham* (107 U. S., 174, 188) and *DeCamp* v. *Dobbins* (29 N. J. Eq., 36). In the Jones case, which arose in Georgia, the point was made on behalf of the heirs and next of kin of the testator that a bequest to the Georgia Historical Society in excess of the amount it was authorized by its charter to hold, was void, and it was said by Mr. Justice GRAY that there were two conclusive answers to it: First. That restrictions imposed by the charter of a corporation upon the amount of property that it may hold cannot be taken advantage of collaterally by private persons, but only in a direct proceeding by the State; and, second, that the restriction was repealed before the death of the testator. In the De Camp case there was a restriction in the law under which the legatee was incorporated, upon the amount of property the corporation could hold, and it was held that the heir could not take advantage of it, citing, among others, the Bogardus case, hereinafter referred to ; and it was also said that the restriction had been, in fact, removed by a subsequent act passed before

the death of the testator. On the other hand, it was held by the Court of Appeals in Kentucky, in the case of *Cromie's Heirs* v. *Louisville Orphans' Home Society* (3 Bush., 365), where there was a devise and a bequest to a corporation beyond its power to take, that the heirs and next of kin were entitled to the excess, and this although they recognized the rule at law to be as laid down in Leazure and Bogardus cases. In equity they held it different.

There is a wide distinction between the case at bar and cases where there has been a grant to a corporation for a valuable consideration, and the grantor seeks to avoid on the ground that the power of the corporation to take is exhausted (*Christian Union* v. *Yount*, 101 U. S., 353), or where property has been used for purposes different from those allowed by charter (*Barrow* v. *Nashville and Charlotte T. Co.*, 9 Humph., 304), or obtained when not necessary for its business (*Cowell* v. *Springs Co.*, 100 U. S., 56), or cases where national banks have taken securities not authorized by the law of their incorporation. (*National Bank* v. *Matthews*, 98 U. S., 621; *National Bank* v. *Whitney*, 103 id., 99; reversing *Crocker* v. *Whitney*, 71 N. Y., 161.) The element of estoppel would seem to be strongly applicable in such cases. In 3 Washburn on Real Property (4th ed.), 267, the rule is stated that if a corporation, by an original purchase, exceeds the prescribed amount, nobody but the State can interfere.

The English mortmain acts were not re-enacted in this State (2 Kent, 282); they were certainly not in force here after May 1, 1788. Chapter 46 of the laws of that year, last section, provided that after that date none of the statutes of England or of Great Britain shall operate or be considered as laws of this State. So that arguments drawn from the policy of those acts would be of doubtful application here.

The Court of Appeals, in the Chamberlain case, has given us some law on the subject, which must, of course, control our action. That was an action brought by one of the heirs-at-law and next of kin of Benjamin Chamberlain, deceased, to determine, among other things, whether a bequest to the Chamberlain Institute was valid. That institute was a literary institution, incorporated under the laws of this State, and having the power, under the Revised Statutes, to take and hold by gift, grant or devise (1 R. S., 462, § 42) real or personal property, the clear yearly income or revenue

of which shall not exceed the value of $4,000. It was held at General Term (*Chamberlain* v. *Chamberlain*, 3 Lans., 389) that the corporation could, as against the plaintiff, take in excess of the restriction, but could not hold as against the State only. In the Court of Appeals (43 N. Y. 439) this ruling was reversed, and it was held that the plaintiff could take advantage of the limitation. Judge ALLEN, delivering the opinion of the court, says: "The institute can 'take and hold' property within the limits prescribed, but can neither take or hold in excess of that limit, effect will not be given to a transgressive bequest in excess of the amount authorized. Claiming property and seeking the aid of the courts to reach it, the corporation can rely only on the warrant and authority conferred by law, and cannot claim in transgression or excess of that authority. The statute permits the corporation to take property of a given yearly value, and prohibits the taking in excess of that value. * * * Doubtless the restriction upon corporations is a governmental regulation and one of policy, and to be enforced by the government; but an individual whose interests will be affected by a transgression of the rule may assert and insist upon the limitation as a restriction upon the power of the corporation to take." In this case at General Term (3 Lans., 348) reliance was placed by the court on the Leazure case, and on the opinions of Senator FURMAN in the case of *Humbart* v. *Trinity Church* (24 Wend., 587), and Vice Chancellor SANDFORD in *Bogardus* v. *Trinity Church* (4 Sandf. Ch., 633), both stating broadly that conveyances to corporations in excess of their power to take and hold, were good as against everybody but the State. So that the Court of Appeals, in reversing the General Term, necessarily repudiated the doctrine laid down in those cases, so far as applicable to the right of heirs and next of kin to reach property willed to corporations beyond their power to take and hold. In the Chamberlain case, also, the effect of the acts of 1840 and 1841 was under consideration. It was claimed that those acts repealed by implication the previous restrictive statute, and that view was sustained by the General Term. The Court of Appeals held the other way, and that the restriction was not removed, and that those acts were not in any sense repugnant to the general law of the State limiting and restricting the amount or value of property

which can be taken and held by such institutions. If so, the manner of taking and the purpose might be regulated by those acts, but the other statutes would have to be examined to ascertain the limitations. And if the statute limiting the amount that colleges can take, and referred to in the first section of the charter, is in force as to the university, except as it is modified by section 5 of the charter, it could hardly be said that there was an unlimited power in the university to take.

The Chamberlain case, in effect, takes the State out as a factor in the controversy, and establishes the right of the heirs and next of kin to take advantage of any transgression of the law, which, in this case, is holding beyond the special amount. If so, the proposition is [reduced to this: The corporation can take, but cannot as against the heirs and next of kin hold beyond the limit. If so, there is no effectual right to take beyond the limit. It is further suggested that the corporation can take, but not hold against the State only, in the same manner that an alien can take a title good as to everybody, but the State. It is sufficient, perhaps, to say that this was presented in the Leazure case as a reason for the rule there held, and that the Court of Appeals in repudiating the rule of the Leazure case, in effect, held that the argument from analogy was not applicable. The policy of our State on the two subjects is different. We, therefore, do not see our way clear to hold that the corporation can take without limit and hold against everybody but the State, but we must hold that the corporation cannot against the appellants take beyond its capacity to hold under its charter, and that capacity must be determined as of the date of the death of Mrs. Fiske. (*White* v. *Howard*, 46 N. Y., 167; *Hollis* v. *Drew Theo. Sem.*, 95 id., 166.)

We now come to the question as to the amount of property held by the university. The surrogate has found that on the 30th of September, 1881, Cornell University held and owned property derived from individuals to the amount of $598,588.65; that it held and owned property derived from the nation and State to the amount and value of $2,088,012.78 (made up of western land contracts $439,834.22, western lands $1,648,178.56) but that this item was due or payable to the State. The university also held the "Cornell endowment fund," so called, amounting to $128,596.61,

and there was in the hands of the comptroller the "college land scrip fund," so-called, amounting to $473,402.87, making an aggregate of $3,288,600.91.

The claim of the appellants is that all these classes of property were the property of the university within the meaning of the statutory limitations. The claim of the respondents is that none were such property except the first. All except the first have origin in land scrip donated by the United States to the State of New York by the act of congress, approved July 2, 1862.

By this act, which is entitled "An act donating the public lands to the several States and territories which may provide colleges for the benefit of the agricultural and the mechanic arts," there was granted to the several States, for the purpose therein mentioned, an amount of public land equal to 30,000 acres for each senator and representative in congress. In case there were within any State public lands subject to sale at a certain rate, provision was made for selecting from such lands the amount to which that State was entitled; but as there were no such lands in this State, the provisions on that subject are not here important. In other cases it was provided that land scrip should be issued to the amount to which the State was entitled, "said scrip to be sold by said States and the proceeds thereof applied to the uses and purposes prescribed in this act, and for no other use or purpose whatsoever; provided, that in no case shall any State to which land scrip may thus be issued be allowed to locate the same within the limits of any other State or of any territory of the United States, but their assignees may thus locate said land scrip upon any of the unappropriated lands of the United States subject to sale at private entry at one dollar and twenty-five cents or less per acre." All moneys derived from the sale of such land scrip "shall be invested in stocks of the United States, or of the States or some other safe stocks, yielding not less than five per centum upon the par value of said stocks, and the moneys so invested shall constitute a perpetual fund, the capital of which," except that a sum not exceeding ten per cent of the amount recived by any State may be expended for the purchase of college sites or experimental farms whenever authorized by the legislature of the State, "shall remain forever undiminished, and the interest of which shall be inviolably appropriated by each State which may

take and claim the benefit of this act, to the endowment, support and maintenance of at least one college where the leading object shall be, without excluding other scientific and classical studies, and including military tactics, to teach such branches of learning as are related to agriculture and the mechanic arts, in such manner as the legislatures of the States may respectively prescribe, in order to promote the liberal and practical education of the industrial classes in the several pursuits and professions in life." It was among other things provided as conditions of the grant that if any portion of the fund or of the interest thereon should by any action or contingency be diminished or lost, it should be replaced by the State, and the annual interest be regularly applied without diminution to the purposes named; also, that "no portion of said fund, nor the interest thereon, shall be applied directly or indirectly, under any pretense whatever, to the purchase, erection, preservation or repair of any building or buildings." The governors of the several States to which scrip should be issued were required to report annually to congress all sales made of such scrip until the whole should be disposed of, the amount received for the same and what appropriation had been made of the proceeds.

The State of New York by chapter 460 of 1863, in substance accepted the grant with its conditions, and authorized the comptroller to receive the land scrip, and, with the approval and concurrence of certain other State officers, to sell the same or any part thereof. There was no direction as to price. The legislature the same year passed an act (Chap. 511) giving to the people's college at Havana the benefit of the income of the expected fund upon certain conditions. In due time the comptroller received scrip representing 989,920 acres. Of this 76,000 acres were sold in 1864 at about eighty-five cents per acre, realizing $64,440, when, as reported to the legislature of 1865 by the comptroller, sales almost entirely ceased in consequence of other States reducing the price to a much lower rate than that at which it was held by this State. The people's college was apparently unable to comply with the conditions upon which its right to the income of the fund depended. Thereupon, April 27, 1865, the act (chap. 585), was passed incorporating Cornell University. It provided among other things, that the farm and grounds to be occupied by the corporation, whereupon its build-

ings should be erected, should consist of not less than 200 acres; that the leading object of the corporation "shall be to teach such branches of learning as are related to agriculture and the mechanic arts, including military tactics;" that "the income, revenue and avails which shall be received from the investment of the proceeds of the sale of the lands, or of the script therefor, or of any part thereof, granted to this State by the act of congress," be appropriated and paid over to the trustees of the corporation "for its use and behoof. in the mode and for the purposes in said act of congress defined, provided, however, that no part of such payment shall be made unless the said trustees shall prove to the satisfaction of the comptroller, within six months after the passage of this act, that the said corporation posseses a fund of $500,000 at least, given by Ezra Cornell" absolutely; and provided further that within the same time said Cornell should pay the trustees of Genesee College $25,000 for the purpose therein specified; and provided further that the People's College should not in the manner therein specified obtain the benefit of said fund; that the trustees of the university, if they shall become entitled to the benefits of the act, shall within two years from its passage, make provisions to the satisfaction of the regents, in respect to buildings, fixtures and arrangements generally, to fulfill the provisions of the act of congress; that from and after the time the corporation shall have become entitled to the benefits of the act, the "university grounds, farm, workshops, fixtures, machinery, apparatus, cabinets and library shall not be encumbered" or disposed of, except on terms such as the legislature of the State of New York shall have approved; that the institution shall annually receive students one from each assembly district of the State, to be selected as in the act provided, and give them instruction free of any tuition fee or of the ordinary incidental charges.

The People's College did not succeed in perfecting their right to the benefit of the fund, and Cornell University did comply with the conditions imposed on it.

In 1866, the comptroller reported to the legislature that during the year ending September 30, 1865, no sales of land scrip were made, but that after that date 100,000 acres had been sold to Ezra Cornell for $50,000, upon the condition. that all the profits which should accrue from the sale of the land should be paid to the Cornell

University. Mr. Cornell seems to have made the proposition, which was accepted, that he would purchase that amount at fifty cents an acre, and, in addition, would pay over to the university all the profits. On the 10th of April, 1866, the legislature passed an act (chap. 481), entitled "An act to authorize and facilitate the early disposition by the comptroller of the lands or land scrip donated to this State by the United States." This act authorized the comptroller to fix the price at not less than thirty cents per acre. He might contract for the sale thereof and sell the same to the trustees of the Cornell University. If the trustees should not agree with the comptroller for the purchase then the commissioners of the land office might receive from any person or persons an application for the purchase of the whole or any part at the price fixed by the comptroller, "and may, if they are satisfied that the said person or persons will fully carry out and perform the agreement hereinafter mentioned, sell the same or any part thereof to the said person or persons. But said trustees, or such person or persons shall, at the same time make an agreement, and give security for the performance thereof to the satisfaction of the comptroller, to the effect that the whole net avails and profits from the sale of scrip or the location and use by said trustees, person or persons, of the said lands or of the lands located under said scrip shall, from time to time, as such net avails and profits are received, be paid over and devoted to the purposes of such institution or institutions as have been or shall be created by the act chapter 585 of the Laws of 1865, of the State of New York, in accordance with the provisions of the act of congress hereinbefore mentioned."

No application for the purchase was made by the trustees or by any one except Ezra Cornell, and with him a contract was made, dated August 4, 1866. By this the State, through the commissioners of the land office, agreed to sell to Cornell the balance of the land scrip, he to receive the same in parcels representing not less than 25,000 acres, and paying into the treasury of the State, at the time of the transfer, at the rate of thirty cents per acre in money or certain securities, and at the same time depositing with the comptroller certain securities to an amount equal to an additional thirty cents per acre, as security for the performance of other portions of the contract. Cornell agreed to purchase the whole scrip and select and locate lands under it within four years, and to sell the lands

within twenty years, and he agreed to report annually to the comptroller a full account of sales and leases made by him and to pay into the treasury of the State the whole of the net profits, to be ascertained by deducting from the gross receipts on sales "the original cost of thirty cents per acre," the costs and expenses attending the location, management and sale, the taxes paid, and interest on sums expended. From such payments into the treasury, it was provided that "a portion equal to thirty cents per acre shall be added to and form a part of the fund known and designated on the records of the comptroller's office, as the 'college land scrip fund,' and the remainder shall constitute a separate and distinct fund, which shall be the property of the Cornell University, to be known as the 'Cornell endowment fund,' the principal of which shall forever remain unimpaired, the income to be annually appropriated by the legislature and paid over from time to time to the trustees of the Cornell University, to be by them devoted to the purposes of the institution." Prior to the execution of this contract there had been negotiations between Mr. Cornell and the comptroller, in which Mr. Cornell claimed that the profits should not be held subject to the restrictions which the act of congress placed on the fund derived from the sale of the college land scrip, or as a donation from the government of the United States, but as a donation from Ezra Cornell to the university A draft contract had been prepared on behalf of the State which did not contain the expression "which shall be the property of the Cornell university" There had also been certain proceedings by the commissioners of the land office on the subject of the price. The comptroller reported to them that in pursuance of the act of 1866 he had fixed the price at fifty cents per acre. Thereupon the commissioners adopted a resolution that the minimum price named in the act would be, in their opinion, all the comptroller should ask, provided the security for the performance of the requirements of the act shall be tangible and ample The comptroller seems to have adopted this view, as in his report to the legislature in 1867, he stated that the sale was at thirty cents an acre, stating also the agreement of the purchaser as to the profits The comptroller in his report in 1867, to the constitutional convention, of the proceedings of the commissioners of the land office under the act of 1866, stated that the commissioners assumed that the ultimate

profits to be derived from the location and sale of the lands by the purchaser formed no part of the purchase-money and were not within the restrictions of the act of congress. The constitutional convention seem to have adopted the same view, as in article 9 of the proposed constitution it provided for the application of the revenues of the college land scrip fund in the mode and for the purpose defined by the act of congress, but it provided that the revenues of the Cornell endowment fund should be applied generally to the use and benefit of the Cornell University.

On May 4, 1868, the legislature passed an act (chap. 554), authorizing the investment of moneys belonging to the Cornell endowment fund on bond and mortgage and provided that " the said fund and the interest and income thereof, subject to the expenses of the care and management of the same, shall be held for and devoted to the purposes of the said Cornell University, in pursuance of the contract before mentioned," being the contract dated August 4, 1866. In 1869, the comptroller (Judge ALLEN) reported to the legislature that he had declined to loan the Cornell endowment fund on bond and mortgage, on the ground that it was a part of the purchase-money of the lands donated by the act of congress, and, therefore, subject to the restrictions of that act, which did not allow that manner of investment. He considered the transaction with Mr. Cornell in the nature of an agency for the State and not a sale. The opinion of the attorney-general was submitted, taking the same views substantially. The legislature seems to have taken no action except that it appropriated the income of the Cornell endowment fund to the Cornell University, expressing it to be pursuant to chapter 554 of the Laws of 1868. (Session Laws of 1869, chap. 1542.) The appropriation was made the same way in 1870 (chap. 281 ; 1 Session Laws, 632) ; in 1871 (chap. 718 ; 2 Session Laws, 1613), and in 1872 (chap. 541 , 2 Session Laws, 1252). In 1873 a concurrent resolution was adopted (Session Laws, 1409), authorizing the governor to appoint a commission of three persons to inquire into the condition of the college land grant, and, particularly, among other things, whether the act of congress and the act of the legislature of 1863 were complied with in the sale ; what securities could be taken and whether the charges of Mr. Cornell for expenses of location, management and sale could be deducted from the proceeds,

and what steps should be taken in order to properly secure the funds in compliance with the act of congress. This commission reported in April, 1874, two of the commissioners holding that all the profits of Cornell, made from the lands, were part of the purchase-money and subject to the restrictions of the act of congress, and that the Cornell endowment fund could not legally be distinguished from the college land scrip fund. The other commissioner dissented from these views. No action was then taken by the legislature.

At the date of the contract, August 4, 1866, the college land scrip fund was $114,440, being derived from the sales of scrip to the amount of 176,000 acres. There was left of scrip 813,920 acres. This was all transferred to Cornell under the contract prior to October 13, 1874. He had sold in scrip or located land to the extent of 381,920 acres, and had paid to the comptroller sixty cents an acre thereon, thereby increasing the land scrip fund to $343,592, and had also paid to the comptroller the balance of the proceeds, being $128,596.61, which then constituted the Cornell endowment fund. The balance of the scrip, 432,000 acres, Cornell had located and still held the land, the first thirty cents an acre being secured to the comptroller but not paid. At that date, October 13, 1874, Cornell University, with the consent of the comptroller and commissioners of the land office, took the deed of said lands from said Cornell, assumed all his obligations in said contract and paid the comptroller $129,600 in cash, being the first thirty cents an acre of said lands, thereby making the land scrip fund $473,192. The other thirty cents an acre had not been paid to the comptroller at the time of the death of Mrs. Fiske. Of those lands so conveyed to the university there remained unsold, on the 30th of September, 1881, 310,076.49 acres, of the value, as found by the surrogate, of $1,648,178.56, and the university also held land contracts for land thus transferred by Cornell and afterward sold by the university, to the value of $439,834.22, being items hereinbefore stated. The market-price and value of the scrip on the 4th of August, 1866, is found to have been sixty cents per acre.

On the 18th of May, 1880, the legislature passed an act (chap. 317), by which the comptroller was authorized and directed, upon the request of Cornell University, to assign, transfer, pay and

deliver to the university "all moneys, securities, stocks, bonds and contracts constituting a part of or relating to the fund known as the Cornell endowment fund now held by the State for the use of said university." In pursuance of this law, the said fund was transferred to the university on June 5, 1880, being at the time upon its face $127,285.81.

These are the main facts in regard to the origin of this property. The question of ownership, so far as the State is concerned, depends on the construction to be given to the contract of August 4, 1866. This contract has never been repudiated by the State; we cannot assume that it ever will be, even if it could be. The State officers who made it, assumed that the profits that might arise from the transaction to the purchaser would not be a part of the purchase-price of the scrip, and, therefore, in the contract those profits were not made subject to the restrictions of the act of congress. The legislature deliberately accepted this view and ratified the contract, when in 1868 they authorized other kind of investment for the endowment fund, and provided that that fund should be held for and devoted to the purposes of the university in pursuance of the contract. And thereafter, although State officers of high positions and learning doubted the validity of the act and hence of the contract, still the legislature for four successive years by its appropriations, in terms, in pursuance of the act of 1868, ratified that act and the contract. Then in 1873 and 1874 when, upon investigation by an able commission, the question was sharply raised as to the character of this fund, and a majority of the commission held that the profits were a part of the price and the whole belonged to the State as a trust fund, still the legislature, apparently preferring the views of the minority of the commission, took no action toward setting aside the contract, but continued to recognize the separate character of the endowment fund and made appropriations from it to the university. Then in 1880 the whole, being recognized as a fund belonging to the university, was transferred to it, unconditionally, thus boldly violating the act of congress, provided that act had anything to do with the profits arising to the purchaser upon a sale of the scrip. There can, therefore, be no doubt about the position of the State as to the contract. It considered itself

bound by it and we must assume that it was bound as far as it could be under the act of congress.

Under the contract, this endowment fund and all property that by it was to make a part of that fund, which would include the items western lands and contracts hereinbefore stated, as derived by the university from the State and nation, were declared to be *the property of the Cornell University.* This was so declared purposely and very apparently upon the idea that it should not be considered as a part of the price of the scrip and, therefore, subject to the act of congress. This was one of the considerations and, perhaps, the main one for the undertaking of Mr. Cornell. He was to devote time and money largely to the enterprise, not upon a certainty, but on a contingency. He was hopeful, but there was no one else ready to undertake it. He was willing to risk it, provided the profits should be deemed a donation, not from the United States to the university, but from himself. And the State was willing to be the custodian. The separation of the two funds in the contract indicates clearly the design. True, it was to be paid over to the State, but only in trust for the university and for its use. The university was the sole beneficiary. It then was the equitable owner, as it afterwards became also the legal owner. We see no way to escape from the conclusion that under the contract this property was, as the contract says, the property of the university, and if so, was not a part of the trust fund, subject to the act of congress.

But did the State have authority to make such a contract? Under the act of congress this State received only scrip. This it had no right to locate, all it could do was to sell it. The proceeds of the sale were to be applied to the uses and purposes prescribed in the act and for no other use or purpose. The manner of the sale was not regulated; it was assumed that each State in that regard would look out sufficiently for its own interests. It was not bound to sell at auction; it could select its purchaser if there was more than one who wanted to buy. If Mr. Cornell was willing to take all the risks and give the university all the benefits, if any, there was nothing to prevent the State helping to carry out that object. The sale, in substance, was to Mr. Cornell and the university together, the one bearing all the burdens and the other taking all the profits. And the fact that the State was made the custodian of these profits

for the benefit solely of the university, did not in any sense make those profits a part of the purchase-money of the scrip. If they were considered so, then the State was in effect engaged in the business of locating and selling western lands, a thing it was forbidden to do by the act of congress. So, it would follow that the State would be obliged to bear the entire expense of the management and would be bound to replace any part of the principal or interest that by any action or contingency might be lost or diminished. This result was certainly not contemplated by congress as to any profits from sales. It was the duty of the State to sell the scrip. The time and the manner and the rate were discretionary. That discretion would not be reviewed or investigated, assuming there was no fraud or bad faith, and those are not charged. That being so, there would seem to be no doubt about the authority of the State in the matter. Under the contract the principal of the college land scrip fund, designated as the trust fund contemplated by the act of congress, gets the benefit of the full market-price of the scrip at the time. The payment of a portion of it is postponed, but that was a matter that the recipient of the income was chiefly interested in and that party was fully satisfied.

But it is said that the university now owes the State the full amount of this property under the contract. Not so. At most all it owed to the State was the custody. That was all Cornell agreed on this subject to give the State. The purchase-price is one thing, and some restriction on the use of the property or on the disposition or custody of the profits is another. The profits naturally belong to the purchaser. He had the right, as in this case, to give them to another party, not the State. The State has surrendered its right to the custody. Whether it can resume it or not is not important here to determine. The ownership is in the university. It does not appear that the general government has ever made any question about the matter, and it therefore may, perhaps, be said that the question before us should be determined solely by the situation as in fact existing between the State and the university. Be that as it may, we are of the opinion that the western lands and contracts and endowment fund held by the university on the 30th of September, 1881, must be reckoned as a part of its property under the limitation of its charter, subject, however, to the deduction of

$129,600 due to the land scrip fund for the last thirty cents an acre on 432,000 acres above referred to.

The situation of the college land scrip fund is different. That is the trust fund contemplated by the act of congress and is not the property of the university. The income of it is, however, payable to the university without limit as to time, and therefore it is claimed that the interest of the university in that fund is equal in value to the whole fund, in analogy to the theory that a party who is entitled to the rents and profits of property forever is entitled to the property. Still the facts remain that the principal is a trust fund and does not belong to the university. The income is received from time to time, not by virtue of an established, perfected grant or gift, but rather in consideration of the performance of continuous duties and services. By the act under which it receives the income it was obligated to have its buildings and equipments prepared and kept suitable for certain objects, and to furnish tuition free to a certain extent. These burdens it assumed in consideration of its receiving the income, and they will continue as long as the income continues. The exact amount of the annual expense arising from these burdens is not shown; we cannot assume it to be less than the income or more for that matter. We must rather assume that the one was deemed to be the equivalent of the other; or, perhaps, more properly, that the income was given, and the corporation also allowed to hold property to a certain extent, altogether for the purpose of the performance of all its duties and obligations and the accomplishment of all its objects as contemplated by its charter. In this view, the amount of the college land scrip fund should not be reckoned as part of the charter limitation. This conclusion makes it necessary to consider a question presented by the appellants as to the valuation of the university grounds and buildings. In the list of property described as funds derived from individuals and aggregating $598,588.65, there is the following: " The farm and grounds on which the university buildings are located, consisting of about 260 acres, including the buildings and reservoir, $69,683.33."

It is claimed by the appellants that the court below in making this valuation adopted an erroneous rule, and that under the correct rule the value, upon the evidence, would be at least half a million. The estimates of the witnesses on the part of the respondents were

followed in arriving at the amount. Their estimates covered the value of the farm for use as a farm or for building lots, and the value that could. be realized from the buildings for other than university purposes. For example, one witness stated as follows : " In the first place, the basis of value was upon the supposition that it was for sale upon the market to get what we could for it, and upon that basis I assumed that the land — 260 acres — supposing it stood naked with farm buildings, is worth $100 an acre — $26,000 ; from that point I tried to estimate, as near as my judgment would permit me, the value that the buildings would have other than for university purposes, for sale on the market, and I estimated them in this way in the belief that they would be of very little use to anybody ; that in fact the farm would be worth as much without them as with them ; the buildings are not adapted to anything else except their present uses ; nevertheless, I assumed they might possibly have some value ; possibly to tear down ; they might be rented or used at a small value," and he put the value of the whole at $72,000. The rule adopted was, in substance, the amount of money into which the property could be converted for other than university purposes. To sustain this rule, the *Hollis Case* (95 N. Y., 178) is relied on by the respondents, not as a decision in point but as analogous. In that case the question arose under chapter 360 of 1860, prohibiting devises or bequests to certain corporations to more than one-half of the estate after the payment of debts. The sums bequeathed to the corporations were first given for life to other persons and at their death were to be paid to the corporations. The question was whether, in determining as to the violation of the statute, these bequests were to be taken at their full amount or at the amount less the value of the life estates. The latter was held, and Judge EARL, in discussing the question, said : " To ascertain whether a testator has given more than one-half of his estate, his whole estate must be treated as converted into money at his death, and if the money value of the portion given is not more than one-half, then the statute has not been violated." In that case there was in the will a direction to convert the estate into money. The case of *Betts* v. *Betts* (4 Abb. N. C., 317, 398), is also cited. In that case there was a bequest to the New York Institution for the Blind, which by its charter (chap. 214 of Laws of 1831), was authorized to hold real and personal estate for the purposes of its incorporation " which at

any time shall not exceed the annual income of $10,000." It had certain grounds and buildings of large value that yielded no income, aside from their use by the corporation for the purposes of its charity. It was held that the value of such use, or the interest on the value of the property, was not "annual income" within the meaning of the law, and it was said that if the value of the use was the test, it was not to be estimated on the value of the real estate if devoted to other purposes, but upon its use to the corporation for the special purpose to which it was adapted.

The present question is not what is the value of the property for the purpose of its division or distribution as part of an estate, but its value as *property held*, not for traffic or disposal, but for the purposes of the corporation. The limit is not according to income, and it therefore may be inferred that the aggregate is to be made up without reference to income. The charter, containing the limit, contemplated that large expenditures would be made for buildings, still those were not excluded from the limit. The buildings in fact constitute the chief intrinsic value, represented by the item under consideration. Are they to be disregarded substantially in fixing the value? Can such an intent be fairly attributed to the legislature? Here are buildings that concededly are adapted to and necessary for the uses and purposes of the institution. They are comparatively new; the cost of their erection was in the neighborhood of $600,000. If destroyed they would have to be replaced if the objects of the institution were carried out. An insurance is carried upon them of about $400,000. Their value, if based on their present cost less the difference between new and old, would, according to the estimates of the appellant's witnesses be $500,000 and upwards. The statutory limitation must be reasonably construed. Will it be, if this main element of present value be disregarded and the value determined, not upon the property as it now is, but upon it in a condition not existing or expected to exist? Can funds be obtained and laid out, without limit, for necessary buildings that are worth to the corporation all they cost, and still nothing, or comparatively nothing, be held under the statutory limit? We think not. If such a result was designed the statute would have said so. It looks to us reasonably clear that an erroneous rule was adopted in the court below.

The grounds and buildings were held and used as an entirety, and, therefore, generally speaking, their value as a whole is the thing to be ascertained. Such value relates to the condition in which they in fact were at the date in question. If the property, as it stood, had a market value, that would control. But it had not. It, therefore, would be competent to show the present cost of such buildings, and the extent to which there had been deterioration, or the difference between new and old. Assuming that the buildings were adapted to and necessary for the uses and purposes of the institution, that would be an element to be considered.

For the purposes of the statute we think the test is, generally, the value of the property as then held and used by the corporation. Assuming adaptation and necessity and no market value, then it would be the value for university purposes, which would be substantially represented by the present cost of building, less difference between new and old. Evidence was given on this basis by the appellants, but not by the respondents. If the respondents should desire an opportunity to present such evidence, we think they should have it. But we infer from their brief that, in case their rule as to valuation was held to be incorrect, they would be content to have this court fix the valuation, so far as it was here material, on the evidence already in the case. Upon that assumption we think that the appellants would be entitled to the finding that the property, represented by the item $69,683.33, was at the date in question of the value of at least $385,000. That sum with the other items would exhaust the limit of the charter. Some other questions are presented in relation to the rights of the appellants as between each other. These it is not important for us to consider as it was stated on the argument that the appellants had by stipulation harmonized and adjusted their conflicting interests. No point seems to be made by the university on the conveyance of Mr. Fiske to the executor of date October 9, 1882.

The foregoing conclusions lead to a reversal of the decree appealed from, on the ground that Cornell University, having at the date of the death of Mrs. Fiske reached the statutory limit, had not capacity to take the legacies given to it in the will of Mrs. Fiske.

FOLLETT, J., concurred.

Decree of the surrogate of Tompkins county reversed, on the ground that Cornell University at the date of the death of Jennie McGraw-Fiske had reached the limit of its charter, and was not entitled to take or hold any of the property or funds given to it by her will, and the proceedings are remitted to the surrogate with directions to make distribution of the property and funds remaining in the hands of the executor, together with any advances and payments heretofore made by him to Cornell University to the appellants, according to their rights as they then appear, with costs to the appellants payable out of the funds.